STATE OF NORTH CAROLINA v. WILLIAM DAVID LOVIN

No. 192A92

(Filed 3 March 1995)

## 1. Searches and Seizures § 80 (NCI4th)— detention at airport—articulable suspicion of criminal activity—legality of subsequent arrest and inculpatory statement

Officers had a reasonable and articulable suspicion that defendant had been involved in a homicide and properly detained defendant at an airport to investigate the matters about which they were suspicious where an airline employee directed the officers' attention to the defendant, and at that time the officers knew that the victim had been murdered; the victim's Porsche automobile had been taken; a person with a "lot of hair," a gold watch and large frame glasses had been seen driving the Porsche toward the airport; the Porsche was in the airport parking lot with the hood still warm; and the employee who directed the officers to defendant told them he had long brown hair, was wearing a gold watch and was acting suspiciously. Furthermore, officers could ask defendant about the keys in his possession without exceeding the circumstances of his stop, their arrest of defendant after they determined that a key in defendant's possession fit the victim's Porsche was legal, and defendant's subsequent inculpatory statement made at the sheriff's office was not the result of an illegal detention and arrest.

**Am Jur 2d, Searches and Seizures §§ 51, 78.**

**Law enforcement officer's authority, under Federal Constitution's Fourth Amendment, to stop and briefly**

detain, and to conduct limited protective search of or "frisk," for investigative purposes, person suspected of criminal activity—Supreme Court cases. 104 L. Ed. 2d 1046.

2. **Evidence and Witnesses § 693 (NCI4th)— suppression hearing—court's refusal to place excluded answers in record—absence of prejudice**

When the trial court sustained objections to questions defendant asked a witness at a hearing on his motion to suppress, the trial court should have allowed defendant to have the answers placed in the record for appeal, but defendant was not prejudiced by the court's failure to do so where the substance of the evidence defendant wanted to present was apparent from the context of the questions, and several questions of the same import were answered by the witness.

**Am Jur 2d, Trial §§ 436 et seq.**

**Construction of provision of Rule 43(c) of the Federal Rules of Civil Procedure, and similar state provisions, providing for entry into record of evidence excluded by trial court. 9 ALR3d 508.**

3. **Evidence and Witnesses § 651 (NCI4th)— motion to suppress—evidence not conflicting—failure to make findings and conclusions**

The trial court did not err by failing to make findings of fact or conclusions of law before denying defendant's motion to suppress after a *voir dire* hearing where there was no material conflict in the evidence, and the propriety of the trial court's ruling on the motion can be determined on the undisputed facts shown by the evidence.

**Am Jur 2d, Motions, Orders, and Rules § 26.**

**Modern status of rules as to use of motion in limine or similar preliminary motion to secure exclusion of prejudicial evidence or reference to prejudicial matters. 63 ALR3d 311.**

**4. Evidence and Witnesses § 188 (NCI4th)— homosexual videos in victim's condominium—inadmissibility to show aggression by victim**

Two videotapes depicting violent homosexual acts which were found in a murder victim's condominium were not admissible to support defendant's contention that the victim was the aggressor with the intent to sodomize defendant and that defendant killed him in self-defense. If the tapes were admitted to prove the victim's homosexuality, they would have added little proof of this fact to testimony about defendant's homosexuality, which the State conceded, and could have been very inflammatory and unfairly prejudicial. N.C.G.S. § 8C-1, Rule 803.

**Am Jur 2d, Homicide § 302.**

**Admissibility of evidence as to other's character or reputation for turbulence on question of self-defense by one charged with assault or homicide. 1 ALR3d 571.**

**5. Evidence and Witnesses § 3201 (NCI4th)— affidavit— admissibility for corroboration—exclusion not prejudicial**

An affidavit given by a defense witness to defendant's attorney which contained a prior statement consistent with his trial testimony should have been admitted to corroborate the witness's testimony. However, defendant was not prejudiced by the exclusion of this affidavit where it was prepared only a few days before trial and thus would have added little to the trial testimony, and there is no reasonable possibility that the verdict would have been different if the affidavit had been read to the jury. N.C.G.S. § 15A-1443(a).

**Am Jur 2d, Witnesses §§ 641 et seq.**

**6. Evidence and Witnesses § 2750.1 (NCI4th)— evidence of telephone conversation—door not opened to evidence of second conversation**

When the State elicited testimony from a witness as to a telephone conversation with defendant on the day of a murder, it did not open the door to cross-examination of the witness by defendant in regard to a second telephone conversation with defendant later that same day. The specific issue or particular transaction to which the State opened the door was only the first telephone conversation between defendant and the witness.

**Am Jur 2d, Witnesses § 417.**

**7. Evidence and Witnesses § 860 (NCI4th)— impeachment of defendant's exculpatory statements—exclusion of corroborating statement—harmless error**

Assuming that the State introduced a statement made by defendant to his girlfriend for the purpose of impeaching statements other witnesses testified he had made to the effect that he had killed the victim in self-defense and that the trial court erred under N.C.G.S. § 8C-1, Rule 806 by refusing to permit defendant to elicit testimony by the girlfriend on cross-examination concerning a later statement made to her by defendant to corroborate defendant's exculpatory statements, this error was not prejudicial since this testimony ·was not substantive evidence, and it is unlikely that the jury would have felt that an exculpatory statement by defendant to his girlfriend added much to the evidence.

**Am Jur 2d, Evidence §§ 664 et seq.; Witnesses §§ 641 et seq.**

**8. Evidence and Witnesses § 860 (NCI4th)— defendant's letters to girlfriend—details corroborating self-defense claim—exclusion as harmless error**

Assuming that two letters defendant wrote to his girlfriend in which he set forth details concerning his contention that he had killed the victim while defending himself from a homosexual assault were admissible for corroboration under Rule 806, the trial court's exclusion of these letters was not prejudicial error since defendant was able to get into evidence that he stated in the letters that he killed in self-defense, and there is no reasonable possibility that a different verdict would have been returned if defendant had put before the jury more details of the killing as corroborative evidence.

**Am Jur 2d, Evidence §§ 664 et seq.; Witnesses §§ 641 et seq.**

**9. Evidence and Witnesses § 2908 (NCI4th)— cross-examination—opening door to redirect testimony**

Testimony by defendant's girlfriend on cross-examination by defendant that defendant had "told me a different story" as to why she should leave with him opened the door for the State to have her explain this "story" on redirect examination.

**Am Jur 2d, Witnesses § 425.**

**10. Evidence and Witnesses § 3179 (NCI4th)— prior consistent statement—corroboration—exclusion as harmless error**

Where a witness testified that she first thought sounds she heard at the time the victim was killed were from a hedge clipper or gravel in a lawn mower but after learning of the victim's death she decided they could have been gunshots, testimony by a second witness that the first witness had told her that she heard shots at the approximate time the victim was killed should have been admitted for corroboration, but the exclusion of this testimony was harmless error since it would have been cumulative.

**Am Jur 2d, Witnesses §§ 641 et seq.**

**11. Evidence and Witnesses § 2873 (NCI4th)— cross-examination—matters not already in evidence**

Questions asked by the State on cross-examination of defendant's expert witness were not improper because they referred to matters not in evidence, and the trial court did not err by allowing the questions where they were designed to elicit testimony relevant to the issues in the case and were not asked in bad faith. N.C.G.S. § 8C-1, Rule 611(b).

**Am Jur 2d, Witnesses §§ 471 et seq.**

**12. Evidence and Witnesses § 1939 (NCI4th)— expert witness—improper impeachment with article—harmless error**

The trial court erred by allowing the State to impeach defendant's expert witness (a clinical psychologist) by reading to her a statement from an article that denigrated clinical psychologists when the witness had not read the article and there was no showing of its validity. However, this error was not prejudicial where the evidence of defendant's guilt was strong, the questions about the article were a small part of the cross-examination of the witness, and the questions did not impeach the methods used by the witness in her diagnosis and did not directly impeach the diagnosis.

**Am Jur 2d, Expert and Opinion Evidence §§ 125 et seq.**

**Use of medical or other scientific treatise in cross-examination of expert witnesses. 60 ALR2d 77.**

**13. Jury § 270 (NCI4th)— inattentive juror—court's refusal to remove—no abuse of discretion**

Although there was a showing by defendant that a juror in a murder trial might have been inattentive to parts of the case, the trial court did not abuse its discretion by refusing to remove the juror and substitute an alternate juror for him where the testimony of the chief bailiff and the observations of the court support the court's conclusion that the juror could perform his duties.

**Am Jur 2d, Trial § 1705.**

**Constitutionality and construction of statute or court rule relating to alternate or additional jurors or substitution of jurors during trial. 84 ALR2d 1288.**

**14. Evidence and Witnesses § 731 (NCI4th)— question and argument about Satanism—harmless error**

It was error in a murder prosecution for the court to permit the State to elicit testimony from a witness (defendant's girlfriend) that defendant had discussed Satanism with her and for the prosecutor to refer to Satanism in his final argument. However, defendant was not prejudiced by this error since there was no real contention that defendant practiced Satanism, and there was other evidence concerning bizarre behavior and conversations by defendant.

**Am Jur 2d, Appeal and Error §§ 797 et seq.**

**Admissibility and prejudicial effect of evidence, in criminal prosecution, of defendant's involvement with witchcraft, satanism, or the like. 18 ALR5th 804.**

Justices LAKE and ORR did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Hyatt, J., at the 11 November 1991 Criminal Session of Superior Court, Buncombe County, upon a jury verdict of guilty of first-degree murder in a case in which the defendant was tried capitally. The defendant's motion to bypass the Court of Appeals as to additional judgments was allowed. Heard in the Supreme Court 31 January 1994.

**STATE v. LOVIN**

[339 N.C. 695 (1995)]

The defendant was tried for first-degree murder. He was also tried for the larceny of an automobile, two charges of credit card theft, and two charges of credit card fraud.

The evidence showed the defendant, who was eighteen years old, killed the victim in the victim's condominium by shooting and stabbing him on 23 May 1991. The defendant contended he was defending himself from a homosexual assault. After killing the victim, the defendant took from the victim two credit cards and his Porsche automobile. The defendant made purchases using each of the credit cards and then drove the automobile to the Asheville Airport. He was arrested by law enforcement officers in the terminal of the airport.

The defendant was convicted of all charges. After a sentencing hearing, the jury recommended life in prison on the murder charge and this sentence was imposed. The defendant was sentenced to seven years in prison on the other charges to be served consecutively with the life sentence.

The defendant appealed.

*Michael F. Easley, Attorney General, by Jane R. Garvey, Assistant Attorney General, for the State.*

*David G. Belser and Sean P. Devereux, for defendant-appellant.*

WEBB, Justice.

The defendant's first assignment of error deals with a motion by the defendant to suppress all evidence and items obtained by a search of the defendant at the Asheville Airport, all evidence obtained from the defendant as a result of his arrest, and all oral and written statements of the defendant made after he was taken into custody. The court held a hearing on this motion prior to the commencement of the trial.

The evidence at the suppression hearing showed that after the defendant had killed the victim, he took the victim's watch and his wallet. He also took the victim's Porsche automobile. The defendant went to a shopping mall and had a hair weave procedure performed, which thickened and lengthened his hair. This procedure cost $340.72, and the defendant put this charge on the victim's credit card. The defendant then called the airport and made a reservation in the name of the victim to fly to Kansas. The defendant put the cost of the ticket on the credit card.

The evidence showed further that in the afternoon the victim's supervisor went to the victim's condominium and entered it with the help of a locksmith. The supervisor discovered the victim's body and called the Sheriff's Department. A bulletin was broadcast on the radio of the Sheriff's Department notifying listeners to be on the lookout for the victim's Porsche automobile. An administrative assistant for the Blue Ridge Parkway heard the broadcast. While driving home some time after 4:00 p.m., she saw a Porsche automobile which matched the description of the victim's car. She followed the automobile until it stopped at a stoplight. She stopped behind the Porsche and observed that it was being operated by a male with a "lot of hair," a gold watch, and large frame glasses. She followed the Porsche until it turned onto Airport Road. She then went to her home, called the Sheriff's Department, and reported what she had seen.

Several law enforcement officers went to the airport and found the Porsche in the long term parking lot. The hood was still warm. The officers went into the airport terminal and checked the ticket counters. They found that a reservation had been made for a flight to Kansas in the name of the victim. A ticket agent pointed the defendant out to the officers as a man who had been acting nervously at her counter. She told the officers that the defendant was acting suspiciously at "our ticket counter." She described the "suspicious guy" as having "long hair, brown hair, wearing a gold watch."

The officers approached the defendant at approximately 5:30 p.m. The officers asked the defendant for some identification and he produced his own driver's license. The defendant told the officers he had come to the airport in a Yellow Bird Cab. The officers knew that the airport was served by the Yellow Cab Company and the Red Bird Cab Company, but there was not a company named Yellow Bird Cab Company. The officers then asked the defendant to go to a stairwell for more privacy, which the defendant agreed to do.

When they reached the stairwell, one of the officers asked the defendant for permission to search his bag, to which the defendant agreed. The bag contained a Rolex watch, defendant's birth certificate, and receipts from LensCrafters in the name of the victim. One of the officers asked the defendant if he had any car keys and the defendant produced a set of keys, among which was a Porsche key. An officer took the key to the Porsche in the parking lot and determined that the key fit the Porsche. The defendant was then placed

under arrest. The defendant was patted down and the victim's wallet was found in his pocket.

When the defendant was being placed in the patrol car to be taken to the Sheriff's office, he asked, "[w]hat's going on?" He was advised that the victim was dead and he said, "when I left there this morning, he was okay."

When the defendant arrived at the Sheriff's office, he was placed in a room with Mike Bustle, a detective with the Sheriff's Department. Det. Bustle was not to interrogate the defendant but was to stay with him until Hank Whitmire, the detective in charge of the investigation, arrived. Det. Bustle explained to the defendant that he knew nothing of the case and did not want to talk to him about it. The defendant told Det. Bustle that he had done something wrong and was trying to decide what to do, and asked Det. Bustle's advice. Det. Bustle told the defendant that when he was very young he had been taught in Sunday School that the first thing was to confess and ask for forgiveness. He nevertheless asked the defendant not to talk to him anymore and told the defendant that only he could make the decision as to what to do.

Det. Whitmire arrived at approximately 7:15 p.m. He advised the defendant of his rights, and the defendant waived them. After he had waived his rights, the defendant asked Det. Bustle if he "should do what we talked about." Det. Bustle said that it would be helpful. The defendant then made an inculpatory statement. The court did not make findings of fact but denied the defendant's motion to suppress.

[1] The defendant's principal argument under his first assignment of error is that evidence which had been illegally gained was used against him. He says that the evidence seized at the airport was obtained as a result of an unconstitutional detention and that his statement to Det. Whitmire in the Sheriff's office was the result of an unconstitutional arrest. The defendant argues first that he was seized by the officers at the airport without any reasonable, articulable suspicion that he had been involved in a homicide. He argues further that as a result of the unconstitutional detention, evidence was obtained which led to his arrest. He says that his statement to the officers, made while he was being unconstitutionally held, should have been excluded.

In *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889 (1968), the United States Supreme Court recognized the right of a law enforcement officer to detain a person for investigation of a crime without probable

cause to arrest him if the officer can point to specific and articulable facts, which with inferences from those facts create a reasonable suspicion that the person has committed a crime. Any investigation that results must be reasonable in light of the surrounding circumstances.

In this case, when the airline employee directed the officers' attention to the defendant the officers knew: that the victim had been murdered; that his Porsche automobile had been taken; that a person with a "lot of hair," a gold watch and large frame glasses had been seen driving the automobile toward the airport; that the Porsche was in the airport parking lot with the hood still warm; and that a clerk who directed them to the defendant told them that he had long brown hair, was wearing a gold watch and acted suspiciously. If this was not enough evidence to show probable cause that the defendant had murdered the victim, it provided the officers with articulable facts which created a reasonable suspicion that he had committed the crime. The officers could detain the defendant to investigate the matters about which they were suspicious.

When there is an investigative stop of a person based on a reasonable suspicion, any investigation must not exceed the circumstances which justified the stop. *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229 (1983). In order to resolve the suspicion in this case that the defendant had driven the Porsche to the airport, the officers could ask him for the automobile key without exceeding the circumstances that justified the stop.

The defendant contends that if the officers were justified in detaining him at the airport, any statement he made and any evidence seized should have been excluded because he had not been advised of his right to remain silent and his right to have an attorney. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). We do not believe the defendant's rights pursuant to *Miranda* were violated. The officers did not interrogate the defendant in regard to his commission of the crime. They questioned him in regard to his identity and matters incident to the investigation they were authorized to make. The defendant did not make an inculpatory statement at that time.

The defendant also says his statement made in the Sheriff's office should have been suppressed because it was the product of an illegal arrest. He bases this argument on his contention that the stop at the airport was illegal and says the illegal stop caused his arrest to be illegal. We have held that the stop was not illegal.

[2] The defendant also argues that he must have a new trial because he was denied the right to fully cross-examine witnesses at the hearing on his motion to suppress and was denied the right to have the answers put in the record for appeal. Mike Bustle testified at the hearing that he stayed with the defendant in the Sheriff's office until Hank Whitmire arrived to question him. On cross-examination, the defendant's attorney asked several questions of the witness which were designed to show that during the time he was waiting with the defendant Det. Bustle was encouraging the defendant to talk to Det. Whitmire when Det. Whitmire arrived. The court sustained objections to these questions. The court should have allowed the answers to be put in the record, but the substance of the evidence the defendant wanted to present was apparent from the context within which the questions were asked. N.C.G.S. § 8C-1, Rule 102(a)(2) (1992). We can review it. The defendant was not prejudiced by the exclusion of these answers. The questions were largely repetitious. Several questions of the same import were asked of Det. Bustle and he answered them.

When Det. Whitmire was testifying on cross-examination, the court sustained an objection to the following question: "In fact, he was led to believe during the course of the interview he didn't need to talk to a lawyer, wasn't he?" This was an argumentative question the objection to which was properly sustained. The court could make its own conclusion as to what the defendant was led to believe by hearing the evidence. Det. Whitmire was also asked, "[d]id you feel that if a lawyer came down, you wouldn't get a statement from him?" It was not error to sustain an objection to this question. What the detective felt was not relevant. The manner in which the interrogation was conducted determined whether the defendant's statement was admissible. The court sustained objections to several other questions to Det. Whitmire which were designed to show what Det. Whitmire wanted rather than what had happened at the interrogation. In this we find no error.

We also find no error in the sustaining of an objection to a question asked of one of the officers who was at the airport when the defendant was detained. The court would not allow the defendant's counsel to ask the officer whether he intended to let the defendant leave. The officer had already testified that he would not have allowed the defendant to leave. The defendant's question was repetitious.

[3] The defendant also argues under his first assignment of error that he must have a new trial or at least the case must be remanded for a

STATE v. LOVIN

[339 N.C. 695 (1995)]

new hearing on his motion to suppress for the failure of the court to make findings of fact or conclusions of law before denying his motion to suppress. N.C.G.S. § 15A-977 provides that after a hearing on a motion to suppress evidence, the judge must make findings of fact and conclusions of law which must be set forth in the record. If there is not a material conflict in the evidence, it is not reversible error to fail to make such findings because we can determine the propriety of the ruling on the undisputed facts which the evidence shows. *State v. Phillips*, 300 N.C. 678, 685, 268 S.E.2d 452, 457 (1980).

In this case, there was not a material conflict in the evidence as to the facts upon which the resolution of this issue depends. The evidence as to articulable facts which gave officers a reasonable suspicion that the defendant had committed a crime was introduced without contradiction. It was not reversible error for the court not to make findings of fact or conclusions of law after the *voir dire* hearing.

This assignment of error is overruled.

[4] The defendant next assigns error to the court's refusal to allow the jury to see two pornographic videotapes which the officers found while searching the condominium of the victim. These two tapes depicted violent acts of anal intercourse which the defendant contended were similar to the attack the victim attempted to make on him. The defendant argues that this was evidence having a tendency to make the existence of a fact that was of consequence to the determination of the case more probable and was relevant pursuant to N.C.G.S. § 8C-1, Rule 401. *See State v. McElrath*, 322 N.C. 1, 366 S.E.2d 442 (1988). The defendant argues that the tapes would have been of great value to the jury in determining whether the victim was the aggressor with the intent to sodomize him, justifying his killing of the victim in self-defense.

We believe that the fact that the victim had in his possession videotapes which depicted violent homosexual acts has little tendency to show that the victim was the aggressor with intent to sodomize the defendant. It is evidence the victim was homosexual, but the victim's homosexuality is not at issue in the case. Witnesses testified about the victim's homosexuality, and the State conceded the matter. If the tapes had been shown to the jury to prove the victim was homosexual it would have added little to the proof of this fact and could have been very inflammatory and unfairly prejudicial. N.C.G.S.

§ 8C-1, Rule 403 (1992). It was not error to exclude them. *State v. DeLeonardo*, 315 N.C. 762, 340 S.E.2d 350 (1986).

This assignment of error is overruled.

[5] The defendant next assigns error to the exclusion from evidence of an affidavit offered to corroborate the testimony of a witness who testified for the defendant. A corporal in the Marine Corps who had attended high school with the defendant testified that in the spring of 1989, when he was seventeen or eighteen years old, he had fallen asleep in the victim's condominium. He was awakened by the victim reaching into his trousers and fondling his penis. The corporal testified that it took "almost all my force" to repel the victim.

The State cross-examined the corporal with prior statements he had made in two interviews with his attorney, an interview with a detective and an affidavit he had given the defendant's attorney shortly before the trial. This affidavit corroborated the testimony of the corporal. The defendant then asked that the corporal be allowed to read the entire affidavit to the jury. The court refused this request.

The affidavit contained a prior statement of the witness consistent with his testimony. It was admissible to corroborate his testimony. *State v. Yancey*, 291 N.C. 656, 231 S.E.2d 637 (1977); *State v. Britt*, 291 N.C. 528, 231 S.E.2d 644 (1977). We do not believe the error in not allowing the reading of the entire affidavit was prejudicial to the defendant. The affidavit was prepared a few days before the trial. It would have added little to the weight given the testimony of the witness that shortly before the trial he had made a consistent statement to the defendant's attorney. There is not a reasonable possibility that the result of the trial would have been different had the entire affidavit been read to the jury. N.C.G.S. § 15A-1443(a) (1988). This assignment of error involves a question of the law of evidence in North Carolina. It does not, as contended by the defendant, implicate a constitutional question.

This assignment of error is overruled.

[6] The defendant next assigns error to the court's sustaining objections to questions he asked during the cross-examination of the State's witness Angela Mermis. Ms. Mermis lived in Kansas and she had been the defendant's "girlfriend." During the direct examination, she testified that the defendant called her on the day of the murder. She said:

So I asked him, I said, "I just don't understand this," and he seemed so happy and he told me, "Well, I've just been raising a little hell this morning," and he started laughing. I said, "I don't understand what you mean." He said, "We'll talk about this later." He said he had to go shopping and buy some stuff, and that pretty well ended it at that.

The defendant elicited testimony on cross-examination of Ms. Mermis that the defendant called her again on that day while he was in jail. The following colloquy then occurred:

Q. . . . And he also called you again later that afternoon from the jail; is that right?

A. Uh-huh.

Q. And you described what he told you to the investigator for the district attorney's office, Miss Betsy Ervin, and Detective George Sprinkle; is that right?

A. Yes.

Q. He called you collect from the jail?

A. Yes.

Q. And he told you he had shot a man who tried to rape him?

Ms. Dreher: Objection; self-serving.

Mr. Belser: If your Honor please, this is—

Court: Overruled.

Q. Isn't that right?

A. Yes.

Q. And he told you that he had shot the man in self-defense; is that right?

A. Uh-huh.

Q. And he said that he had seen a gun in the house, and that morning, Hodgin had called him into the room and was undressed?

Ms. Dreher: I'll object that it's hearsay, self-serving.

Court: Sustained.

## STATE v. LOVIN

[339 N.C. 695 (1995)]

Mr. Belser: If your Honor please, she's already gone into part of the conversation. This is the other part of the conversation.

Ms. Dreher: Objection.

Court: Objection sustained.

Q. Didn't he also tell you that Hodgin had asked him to do something he didn't want to do?

Ms. Dreher: Objection; self-serving.

Court: Sustained.

Q. You told all this to the investigator for the district attorney's office, didn't you?

A. Yes.

Q. And he told you that he was in the bedroom when he fired the first shot?

Ms. Dreher: I object to the whole line.

Court: Objection sustained.

. . . .

Q. He wrote you letters describing what happened when Mr. Hodgin assaulted him?

A. He wrote me one letter about that.

. . . .

Q. And in that letter does he describe the confrontation and the sexual assault by Mr. Hodgin?

Ms. Dreher: Your Honor, I object. It's self-serving and hearsay.

Court: Objection sustained.

The defendant argues that when the State introduced a part of a statement made by a defendant the defendant was entitled to have the rest of the statement introduced. *State v. Watts*, 224 N.C. 771, 32 S.E.2d 348 (1944). We have held that if the State introduces into evidence a statement made by a defendant, this does not open the door for the introduction of another statement made by the defendant later in the day. *State v. Weeks*, 322 N.C. 152, 367 S.E.2d 895 (1988). When

the State elicited testimony from Ms. Mermis of a statement made by the defendant earlier in the day, it did not open the door for a statement the defendant later made from the jail to Ms. Mermis. The statement did not corroborate defendant's testimony because he did not testify. It would have been hearsay testimony and was properly excluded. *State v. Stanton*, 319 N.C. 180, 353 S.E.2d 385 (1987).

The defendant, relying on *State v. Burgin*, 313 N.C. 404, 406, 329 S.E.2d 653, 656 (1985), and *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981), contends that the State, by eliciting testimony from Ms. Mermis as to a telephone conversation with the defendant, raised "specific issues" or offered "evidence as to a particular fact or transaction" which opened the door to cross-examination by the defendant in regard to the later telephone conversation. The "specific issue" or "particular . . . transaction" to which the State opened the door was the first telephone conversation between Ms. Mermis and the defendant. It did not include later telephone conversations.

[7] The defendant argues further that it was error to exclude this testimony because of the provision of N.C.G.S. § 8C-1, Rule 806, which provides in part:

When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.

The defendant argues that the State introduced through Ms. Mermis his statement to her for the purpose of impeaching statements other witnesses testified he had made showing he had killed the victim in self-defense. He says that under these circumstances, Rule 806 gave him the right to corroborate his statements with a prior consistent statement that he killed in self-defense as if he had testified to it.

Assuming it was error not to allow the admission of this testimony to corroborate the exculpatory statements of the witness, we hold it was not prejudicial error. The testimony could not have been considered as substantive evidence. It was not likely that the jury would have felt it added much to the evidence that the defendant would make an exculpatory statement to his girlfriend.

This assignment of error is overruled.

The defendant next assigns error to the court's refusal to allow him to make an offer of proof of the testimony of Ms. Mermis if she

had been allowed to answer the questions to which objections were sustained. The defendant contends that the court should have let the defendant put those answers in the record for appellate review. In this case, the record is sufficient for us to determine the question presented. This was harmless error. *State v. Chapman,* 294 N.C. 407, 241 S.E.2d 667 (1978).

This assignment of error is overruled.

[8] The defendant next assigns error to the court's refusal to admit into evidence two letters which he had written to Ms. Mermis while he was in jail. The defendant was able to elicit testimony that he said in the letters that he had killed the victim while defending himself from homosexual assault. He wanted to use the letters to show in more detail how he contended the assault occurred.

The State asked Ms. Mermis several questions in regard to what she had done with the letters after she received them and before giving them to the defendant's attorney. The defendant contends that the State by its questions opened the door for him to have the letters put into evidence. The defendant says that by its questions the State infused the letters with relevance and they should have been admitted. The statements in the letters would have been hearsay evidence if admitted. Assuming the letters were admissible under N.C.G.S. § 8C-1, Rule 806, it was not prejudicial to exclude the letters. The defendant was able to get into evidence that he said in the letters that he killed in self-defense. We cannot hold that if the defendant had put before the jury more details of the killing as corroborative evidence, there is a reasonable possibility there would have been a different result.

This assignment of error is overruled.

[9] The defendant next assigns error to the elicitation of certain testimony from Ms. Mermis on redirect examination by the State. The defendant on cross-examination elicited testimony from Ms. Mermis that she and the defendant considered running away to California and on one occasion had started to do so. She testified that defendant "had told me a different story about why I had to leave Waukeenee other than running away."

On redirect examination, the State, over the objection of the defendant, elicited testimony from Ms. Mermis as to the story defendant told her to induce her to leave with him. She said he told her that her father had been in the Mafia and that his grandfather had been

head of a Mafia family. She testified that the defendant told her that if she would go with him to California, he would get a home for her and would get her father a good job. Later in the trial, she testified over objection that the defendant told her that he would probably serve five years for the murder and that they could then go to Mexico.

The defendant contends this testimony on redirect examination was irrelevant and prejudicial. He says it was reversible error not to exclude it. The witness had testified on cross-examination that defendant had "told me a different story" as to why she should leave with him. This opened the door for the State to have her explain on redirect examination as to the "story." *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994). The testimony that the defendant told the witness that he would serve only five years for the murder was irrelevant. We do not see, however, how it was prejudicial.

This assignment of error is overruled.

[10] The defendant next assigns error to the exclusion of certain testimony in corroboration of the testimony of Ruth Bockelman. Mrs. Bockelman lived in the same building as the victim. She testified that at the approximate time the victim was shot she heard four or five "metallic reports" which, at the time, she thought was the sound of a hedge clipper or gravel in a lawn mower, but which, upon hearing news accounts of her neighbor's death, she decided could have been the sound of gunshots. On cross-examination, she testified that she told the officers all the sounds she heard could have been rocks in a lawn mower.

The defendant put on a witness who would have corroborated the testimony of Mrs. Bockelman by testifying Mrs. Bockelman told her she had heard shots at the approximate time the victim was killed. The court excluded this testimony. The tendered testimony would have corroborated the testimony of Mrs. Bockelman and should have been admitted. *State v. Royal*, 300 N.C. 515, 268 S.E.2d 517 (1980). This was harmless error. There was not a dispute that Mrs. Bockelman first thought the sound she heard was from a hedge clipper or gravel in a lawn mower. The witness' testimony would have been cumulative.

This assignment of error is overruled.

[11] The defendant next assigns error to the allowance of certain questions on cross-examination of his expert witness. Dr. Faye

Sultan, a clinical psychologist, testified as to an extensive evaluation she had done of the defendant. She concluded that the defendant suffered from a post-traumatic stress disorder and child abuse accommodation syndrome and that he reacted in terror under a mental and emotional disturbance to the sexual assault upon him.

The State, on cross-examination of Dr. Sultan, asked her if the defendant had told her he had taken cocaine the night before the killing. The State also asked Dr. Sultan whether she was aware the defendant had been in jail with someone who had used the defense which the defendant was using, thus putting the idea in the defendant's mind. The State next asked Dr. Sultan whether she would think the defendant had a preoccupation with knives if the defendant had told someone that he had engaged in a knife fight in response to the killing of his brother and that his parents had been shot to death in Germany.

The defendant says first that these questions were improper because they referred to matters not in evidence. On cross-examination, a party is not limited to asking questions about matters in evidence. N.C.G.S. § 8C-1, Rule 611(b) provides "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." The questions asked of the witness were designed to elicit testimony relevant to issues in the case. We have said, in regard to cross-examination, "generally (1) the scope thereof is subject to the discretion of the trial judge, and (2) the questions must be asked in good faith." *State v. Williams*, 279 N.C. 663, 675, 185 S.E.2d 174, 181 (1971). Questions asked on cross-examination will be considered proper unless the record shows they were asked in bad faith. *State v. Dawson*, 302 N.C. 581, 586, 276 S.E.2d 348, 352 (1981). There is nothing in the record to show the prosecutor's questions were asked in bad faith. The court did not abuse its discretion.

[12] The defendant also argues under this assignment of error that he must have a new trial because of other questions propounded on cross-examination of Dr. Sultan. During the cross-examination, the following colloquy occurred:

Q. . . . Have you ever seen an article called, "An Expert Witness in Psychology and Psychiatry" written by David Foust and Jay Siskan?

A. No, I have not, but I've been examined about it before.

. . . .

Q.  . . . did anyone point out to you that that article contains reference that studies show that profession[al] clinicians do not, in fact, make a more accurate clinical judgment than lay persons?

. . . .

A.  Yes, I think that quote was read to me yesterday.

Q.  And, in fact, was the follow up to that quote read to you that professional psychologists perform no better than office secretaries in distinguishing visual motor deductions on normal versus brain damaged individuals on commonly employed screening tests?

A.  No, that was not read to me.

The article about which the State cross-examined Dr. Sultan was not established as a learned treatise and was not admissible as substantive evidence. N.C.G.S. § 8C-1, Rule 803(18) (1992). If this testimony was admissible, it would be for the purpose of impeaching the witness. The question is whether it was proper to allow the State to impeach the defendant's expert witness by reading to her a statement from an article that denigrated clinical psychologists when the witness had not read the article and there was no showing of its validity. We hold that this testimony should have been excluded. *See State v. Black*, 111 N.C. App. 284, 432 S.E.2d 710 (1993).

The defendant argues that this error was prejudicial. He says the accuracy of Dr. Sultan's testimony was crucial to his case and if believed could have tended to negate the element of deliberation. We cannot hold that there is a reasonable possibility that had the error in question not been committed a different result would have been reached at the trial. N.C.G.S. § 15A-1443(a) (1988). The evidence against the defendant was strong. The questioning about the article was a small part of the cross-examination of Dr. Sultan. It did not impeach the method she used in her diagnosis. It did not directly impeach the result, but referred to a statement by someone who obviously did not like the profession of psychologists. The jurors knew there were such people and were able to take this prejudice into account.

This assignment of error is overruled.

**[13]** The defendant next assigns error to the court's failure to remove one of the jurors and substitute an alternate juror for him. During the trial, the defendant's counsel made the court aware of the fact that a

courtroom bailiff, Paul Robinson, had told him that one of the jurors had been asleep during a part of the trial. The defendant made a motion that the juror be removed.

The court excused the jury and held a hearing on this motion. The defendant's attorney then made a statement that he had observed the juror who was asleep on several occasions during the trial. Dep. Robinson was not in the courtroom, so the court called the chief bailiff, Sgt. Ron Harwood, to the witness stand. Sgt. Harwood testified that he had observed the juror on several occasions when he thought he might be asleep, but each time he started toward the juror to investigate, the juror raised his head. Sgt. Harwood also testified that the juror got off the elevator on the wrong floor several times and on occasion had to be told which door to enter to get to the jury lounge.

The court recited that it had observed the juror during the trial and that like other jurors at times he would appear to be inattentive. The court concluded that based on the observations of Sgt. Harwood it would not remove the juror.

Later in the trial, the court allowed the defendant to call Dep. Robinson to testify further as to the juror. Dep. Robinson testified that on several occasions the juror was on the wrong floor of the courthouse and had to be directed to the floor that contained the courtroom. He said the juror seemed to be confused. He said that the juror looked as if he was asleep a good part of the time "because his head was nodding quite a bit, and sometimes he could lower his head in this manner and stay that way for several seconds before he would come back—jerk his head back up in that manner." Dep. Robinson also testified that on one occasion when a photographic exhibit was passed to the jury, the juror in question did not turn it over to look at it but simply passed it to the next juror. The court did not change its ruling after the testimony by Dep. Robinson.

The defendant contends that because one of the jurors was dysfunctional he was tried by eleven jurors in violation of the rule of *State v. Hudson*, 280 N.C. 74, 185 S.E.2d 189 (1971). In *State v. Davis*, 325 N.C. 607, 386 S.E.2d 418 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990), we held it was not error for the court to replace a juror who was having child-care problems. In that case we said:

> The trial court's discretion in supervising the jury continues beyond jury selection and extends to decisions to excuse a juror

and substitute an alternate. *State v. Nelson*, 298 N.C. 573, 593, 260 S.E.2d 629, 644 (1979) (juror replaced because could not appear on Saturday), *cert. denied*, 446 U.S. 929, 64 L. Ed. 2d 282 (1980). "These kinds of decisions relating to the competency and service of jurors are not reviewable on appeal absent a showing of abuse of discretion, or some imputed legal error." *Id.* (quoted in *State v. Allen*, 323 N.C. 208, 224, 372 S.E.2d 855, 864 (1988)).

*State v. Davis*, 325 N.C. at 628, 386 S.E.2d at 429. We can find no abuse of discretion by the court in this case. There was a showing by the defendant that a juror might have been inattentive to parts of the case, but the testimony of the chief bailiff and the observations of the court support the conclusion that the juror could perform his duties.

This assignment of error is overruled.

The defendant next assigns error to what he contends was the refusal to let him make an offer of proof on the issue of the competency of the juror to preserve this question for appellate review. The defendant does not say how any additional offer of proof could have given us a better understanding of this issue. We cannot hold the defendant was prejudiced by this ruling of the court. This assignment of error is overruled.

[14] The defendant's final assignment of error is based on a question asked of Ms. Mermis on direct examination and on her answer. The following colloquy occurred:

Q. He also talked about Satanism with you, didn't he?

MR. BELSER: Objection; motion for a mistrial and ask that the State be admonished.

COPURT: Counsel approach the bench, please.

(All counsel approach the bench.)

Q. Angie, my question to you was, "Did he also talk to you about Satanism?"

A. Yes.

The defendant argues that this question and answer together with two references by the district attorney in his final argument to Satanism constituted prejudicial error. In *State v. Kimbrell*, 320 N.C. 762, 360 S.E.2d 691 (1987), we held that it was reversible error for the State to ask the defendant on cross-examination whether he believed

in devil worship. We hold, based on *Kimbrell*, that it was error to ask Ms. Mermis whether the defendant had discussed Satanism with her.

The question is whether this was prejudicial error requiring a new trial. We hold that it is not prejudicial error. This case differs from *Kimbrell* in that the questions in that case were designed to show the defendant practiced devil worship. There was a series of questions asked of the defendant in regard to his participation with that cult. In this case, there was only one question in regard to Satanism. There were also two references to it in the jury argument which should not have been allowed. There was no real contention that the defendant practiced Satanism. There was enough other evidence of the defendant's bizarre behavior and conversations that we do not believe he was prejudiced by this testimony.

This assignment of error is overruled.

For the reasons stated in this opinion, we hold there was

NO ERROR.

Justices LAKE and ORR did not participate in the consideration or decision of this case.