STATE OF NORTH CAROLINA v. ANDRE LAGUAN FLETCHER

No. 117A96

(Filed 9 July 1998)

**1. Searches and Seizures § 80 (NCI4th)— investigatory stop of defendant—reasonable suspicion**

Officers had reasonable suspicion to make an investigatory stop of defendant where one officer received information from two witnesses that, around the time an automobile had been broken into by breaking a window, a tall black male wearing dark pants and a white t-shirt had been acting suspiciously nearby, had picked up a cement block and walked toward the location of the automobile, and moments later had run down an alleyway; the second officer received a transmission from the first officer to be on the lookout for a tall black male wearing a white t-shirt and moving in a certain direction; and the second officer saw defendant, a person fitting this description, just moments later within two blocks of the location specified.

**2. Arrest and Bail § 63 (NCI4th); Evidence and Witnesses § 1611 (NCI4th)— probable cause for arrest—incriminating statements—recovery of evidence—not fruits of unlawful arrest**

Officers had probable cause to arrest defendant for breaking and entering an automobile where officers made an investigatory stop of defendant based upon his proximity in time and location to the crime scene and a physical description of the race, gender and clothing of the suspect by two witnesses, and a short time later one witness identified defendant as the person she had seen acting suspiciously near the automobile around the time of the breaking and entering. The hour-long detention of defendant in a patrol car was reasonable since probable cause was established shortly after the stop. Therefore, incriminating statements subsequently made by defendant about a murder and the recovery of property stolen from the murder victim as a result of those statements were not the fruits of an unlawful arrest.

**3. Evidence and Witnesses § 1259 (NCI4th)— custodial interrogation—statement not invocation of right to silence**

Defendant's statement to officers during custodial interrogation that he would be willing to take them to where he had dis-

**STATE v. FLETCHER**

[348 N.C. 292 (1998)]

carded stolen property after he had gotten some sleep was not an invocation of his Fifth Amendment rights to silence and to have interrogation cease; thus, it was not error for the trial court to admit into evidence defendant's subsequent incriminating statement or the fruits of that statement.

**4. Jury § 123 (NCI4th)— capital case—jury voir dire—no attempt to stake out jurors on death penalty**

The trial court did not improperly fail to prohibit the State from staking out prospective jurors in a capital case with respect to whether they could vote for the death penalty where the prosecutor's questions simply attempted to determine whether the jurors could follow the law in imposing the death penalty and did not presume evidentiary facts or require that the jurors pledge themselves to a position under any given set of evidentiary facts.

**5. Jury § 123 (NCI4th)— capital case—jury voir dire—weighing of aggravating circumstances—no attempt to stake out jurors**

The trial court did not improperly fail to prohibit the State from staking out prospective jurors with respect to whether they would weigh aggravating circumstances more heavily than mitigating circumstances where the prosecutor's questions asked the jurors if they could weigh the significance of the aggravating and mitigating circumstances rather than the relative number of aggravators and mitigators, which questions simply asked the jurors if they could follow the long-settled law.

**6. Jury § 123 (NCI4th)— capital case—jury voir dire—finding of particular aggravating circumstance—vote for death penalty—improper stake-out question**

Defense counsel's question to a prospective juror in a capital trial as to whether the juror would automatically vote for the death penalty if the jury found the especially heinous, atrocious or cruel aggravating circumstance was an inappropriate stake-out question. Even if defense counsel's question were held to be a proper attempt under *Morgan v. Illinois*, 504 U.S. 719, to determine whether this juror would automatically vote for the death penalty without regard for mitigating circumstances, defendant was not prejudiced by the exclusion of this question where the trial court allowed defendant's challenge for cause to remove the juror after subsequent questioning exposed the juror's inability to be impartial and consider mitigating circumstances.

**7. Jury § 259 (NCI4th)— peremptory challenge—absence of racial discrimination—sufficient determination**

The trial court made a sufficient ultimate determination that there was no purposeful racial discrimination in the State's peremptory strike of a prospective juror when the court denied defendant's *Batson* motion and entered the conclusion of law that the prosecutor's reasons for excluding the juror, his expressed lack of confidence in the court system and his prior record, were "race neutral and sufficient to justify the peremptory challenge."

**8. Jury § 259 (NCI4th)— peremptory challenge—male black prospective jurors—racially discriminatory strike of one— discrimination in strike of second not shown**

The trial court's finding of no racial discrimination in the State's peremptory strike of a black potential juror in this capital trial based upon his prior record and his expressed lack of confidence in the judicial system was not error because the court found that the prosecutor's explanation that he peremptorily struck the only other black male in the same panel for his membership in the NAACP, an organization that opposed the death penalty, was not racially neutral and was pretextual where the trial court considered the State's explanations as to the two black male jurors together; the *prima facie* case as to both jurors was not particularly strong given that one black female juror had already been accepted and placed on the jury; and the trial court's determination that the prosecutor's explanation of the strike of the other juror was not race-neutral was predicated as much upon the manner in which the explanation was made as upon the substance of the explanation in that the court found that, when asked to articulate a race-neutral reason to excuse the other juror, the prosecutor did not immediately offer the juror's NAACP membership as the reason but supplied this rationale only after studying the juror's information sheet at length.

**9. Jury § 259 (NCI4th)— peremptory challenge—lack of confidence in judicial system—no racial discrimination**

The trial court did not err by failing to find intentional racial discrimination in the State's peremptory strike of a black prospective juror for his expressed lack of confidence in the judicial system on the basis of disparate questioning of black and white prospective jurors about their views of the judicial system

where the record shows that the prosecutor questioned many prospective jurors, irrespective of race, on their beliefs and feelings about the fairness of the judicial system, and although the questions often were varied in form, the same basic information was sought in each case.

**10. Jury § 259 (NCI4th)— peremptory challenge—race-neutral reasons—passed juror—one common factor—racial discrimination not shown**

Although acceptance by the State of white prospective jurors similarly situated to black prospective jurors who have been peremptorily stricken is a factor to be considered in determining whether there has been purposeful racial discrimination, the trial court did not err in failing to find that a black prospective juror was stricken for impermissible racially discriminatory reasons where defendant found a single factor among several articulated by the prosecutor and matched it to a passed white juror who exhibited the same factor.

**11. Jury § 257 (NCI4th)— peremptory strike of black jurors— prima facie discrimination not shown**

The trial court did not err in finding no *prima facie* case of racial discrimination in the State's peremptory strikes of two black prospective jurors where two of four black jurors had been seated on the jury after the first juror was excused and two of five black jurors had been seated after the second black juror was excused.

**12. Criminal Law § 433 (NCI4th Rev.)— prosecutor's closing argument—no comment on defendant's right not to testify**

The prosecutor did not improperly comment during closing argument on defendant's failure to testify where the prosecutor's remarks were directed toward defendant's failure to offer evidence to rebut the State's case, not at defendant's failure to take the stand himself. The prosecutor's comment that two people know what happened on the night of the murder, one of them is dead, and "the other one is sitting right here" was merely an argument that defendant is in fact the killer; the argument concerning unanswered questions about what happened that night recognizes that the jury might have some unanswered questions which do not prevent the jury from finding defendant guilty beyond a reasonable doubt; and the argument that defendant pled not guilty and thereby required the State to prove the case, read in

context, is an argument that the State has done what the State was required to do and that, based on the evidence presented, defendant's presumption of innocence was overcome. None of these arguments were so grossly improper as to require intervention by the trial court *ex mero motu.*

**13. Criminal Law § 1384 (NCI4th Rev.)— capital sentencing— mitigating circumstance—mental or emotional disturbance—erroneous failure to submit**

The trial court erred by failing to submit to the jury in a capital sentencing proceeding the statutory mitigating circumstance that the capital felony was committed while defendant was under the influence of a mental or emotional disturbance where a psychologist who evaluated defendant several times between his arrest and trial testified (1) that under times of stress, defendant might not perceive reality correctly and that it was likely that defendant had been in a stress-overload situation for a very long time based on his environment and psychological problems, and (2) given defendant's lack of any violent history, defendant would have had to have been "in a very psychotic state or really out of it on drugs" to attack and kill in the manner in which the victim was killed. This testimony was sufficient to link defendant's mental or emotional state to the time of the killing, and a reasonable juror could conclude from this evidence that defendant was under a mental or emotional disturbance at the time of the killing. N.C.G.S. § 15A-2000(f)(2).

**14. Criminal Law § 1382 (NCI4th Rev.)— capital sentencing— mitigating circumstance—no significant criminal history— erroneous failure to submit**

The trial court erred by failing to submit to the jury in a capital sentencing proceeding the statutory mitigating circumstance that defendant had no significant history of prior criminal activity where the evidence tended to show that defendant had a history of stealing since he was a child and that, since 1990, he had been convicted of two counts of felonious breaking and entering, three counts of felonious larceny, felonious possession of stolen property, misdemeanor breaking and entering, five counts of misdemeanor larceny, and assault on a female; the breaking and entering and larceny charges involved only unoccupied vehicles, and there was no evidence prior to the killing of the victim in this case that defendant broke into anyone's home; and numerous witnesses testified that defendant's larcenous history is devoid of

any violence, aggressive or physical behavior, or confrontation with the victims of the larcenies. Given the largely nonviolent nature of defendant's prior criminal activities, a juror could reasonably have concluded that defendant had no significant history of prior criminal activity.

Chief Justice MITCHELL dissenting.

Justice FRYE dissenting in part.

Justice WHICHARD joins in this dissenting opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Warren, J., at the 29 January 1996 Criminal Session of Superior Court, Rutherford County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments for first-degree burglary and robbery with a dangerous weapon was allowed 19 December 1996. Heard in the Supreme Court 17 November 1997.

*Michael F. Easley, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*Ann L. Hester for defendant-appellant.*

PARKER, Justice.

Defendant was indicted 7 September 1994 for first-degree murder, first-degree burglary, and robbery with a dangerous weapon. In January 1996 he was tried capitally and found guilty of first-degree murder upon theories of (i) malice, premeditation, and deliberation and (ii) felony murder. He was also found guilty of first-degree burglary and robbery with a dangerous weapon. Following a capital sentencing proceeding, the jury recommended a sentence of death for the murder, and the trial court entered judgment accordingly. For the first-degree burglary conviction, the trial court entered a consecutive sentence of imprisonment for fifty years, and for the robbery conviction, a consecutive sentence of forty years. We find no error meriting reversal of defendant's convictions. However, for the reasons stated herein, we conclude that defendant is entitled to a new capital sentencing proceeding.

On 17 August 1994 Georgia Ann Dayberry Hamrick ("victim"), eighty-three, was battered and knifed to death in her home in

Spindale, Rutherford County, North Carolina. The State's evidence tended to show that defendant broke into the victim's home, beat her to find out where her valuables were, and then cut her throat. He took several rings, two of which he sold over the next couple of days for $250.00 and $60.00.

In the early morning hours of Wednesday, 17 August, during a summer rainstorm, defendant pulled out the top corner of the front storm door of the victim's house, breaking the pane of glass, and kicked in the wooden door to get inside. Defendant awakened the victim and, taking her into the various rooms of her house, battered her over the head to force her to give him money and jewelry. Blood drops stained the dining room table and floor, and blood spatter stained the dining room curtains and walls. The kitchen cabinets and walls also bore blood spatter, and a large amount of blood was pooled on the kitchen floor and table. The victim attempted to defend herself against the blows but was overpowered. Defendant then cut the victim's throat with a kitchen knife, exposing and lacerating the jugular vein, and left the house. The victim, still alive, was able to move down the hall to her bedroom, where she collapsed in a chair and died.

Searches of defendant's house, located about two hundred yards from the victim's house, produced from defendant's closet a pair of wet Fila tennis shoes whose soles were consistent with shoe prints, in both dust and blood, found in the victim's house and on her front door. A pawn ticket for $60.00, dated Thursday, 18 August, was found in the purse of defendant's girlfriend, Lisa Hill. The ticket was for a diamond and sapphire ring that the victim's family members testified had belonged to the victim. A second of the victim's rings was found behind the television in defendant's house. A search of defendant's car produced a small silver sewing kit that had belonged to the victim.

Upon interrogation, defendant revealed that in the early morning hours of 17 August, he remembered waking up in his house and sitting and looking at ten or twelve rings, not knowing where they came from. He also said that, at that time, he could see in his mind a white woman with a knife, as if he were having some type of vision. He told the police that he was scared because he did not know where the rings came from. He also told the police that on 18 August he and Hill sold one of the rings to a jewelry store and pawned another at a pawn shop. The police recovered these two rings, and the victim's family members testified that they had belonged to the victim. As for the

rest of the rings, defendant said he put some of them in a trash can in a convenience store restroom and some more in a gutter behind a shop in town. The police recovered six rings from the restroom and three more from the gutter where defendant had indicated. Police confirmed that all the rings belonged to the victim.

Defendant presented evidence that despite his possession of the victim's rings there was not enough evidence linking defendant to the burglary and murder; he also presented evidence that the crimes were committed by a person who was seen around the time of the crimes by various eyewitnesses and whom the police never found. Defendant's clothes and shoes, seized from his home, did not produce any evidence of microscopic glass fragments expected to be left from the breaking of the glass in the front storm door, nor did the clothes or shoes test positive for human blood. None of the fingerprints and palm prints found in the victim's home matched defendant's. The Fila shoe prints found in the victim's home, while not inconsistent with a pair of Filas owned by defendant, did not reveal any of the characteristic nicks and cuts present on defendant's shoes.

A witness who lived in the victim's neighborhood testified that during the storm on the night of the murder she saw a man in a yellow raincoat walk by her house in the direction of the victim's house and that a short time later she heard some loud "pops" coming from that direction. She testified that the man's appearance was not consistent with that of defendant. Another witness testified that she saw a man in the neighborhood who was wearing a yellow raincoat, acting very suspiciously and driving a white Grand Am. She also testified that the man's face and general appearance were inconsistent with defendant's appearance.

In short, defendant's argument at trial was that no conclusive blood, hair, fiber, or glass evidence was found on defendant's clothes, in his car, or in his house; and no evidence was presented by the State regarding the identity of the man in the yellow raincoat.

## PRETRIAL ISSUES

Defendant first contends that the trial court erroneously admitted into evidence defendant's statements produced as a result of custodial interrogation and the stolen property recovered as a result of information provided in those statements, in violation of the Fourth Amendment to the United States Constitution and Article I, Section 19 of the North Carolina Constitution. Specifically, defendant asserts

(i) that the Spindale Police stopped him without reasonable suspicion and arrested him without probable cause and (ii) that as a result of the illegal seizure and unlawful arrest, special agents of the State Bureau of Investigation ("SBI") obtained incriminating statements from him and statements that led to the recovery of stolen property. These statements and the property, defendant contends, were the fruits of an illegal seizure and should not have been admitted at trial. We disagree with defendant.

Evidence presented at the suppression hearing concerning the facts and circumstances surrounding defendant's detention and arrest are as follows. At 9:03 p.m. on 18 August 1994, Spindale Police Officer Chris Justice responded to a report of an automobile breaking and entering at the Uptown Beauty Salon located on Main Street in Spindale. When Officer Justice arrived there at 9:09 p.m., Ms. Patsy Hodge reported that she had been inside the salon having her hair done and that when she left she discovered that someone had broken out the right window of her vehicle. Ms. Derlene Watson, the proprietor of the beauty salon, told Officer Justice that while the salon staff had been working on Ms. Hodge's hair, Ms. Watson had seen a tall black male wearing a white t-shirt and dark colored pants walking back and forth on the sidewalk in front of the salon, "just acting suspicious to her." While at the salon, Officer Justice also spoke with Mr. Ray Sprouse, a local resident who told Justice he had seen a black male pick up a cement block from in front of a building and walk back toward the beauty salon and then, about a minute later, saw the same man run down an adjacent alleyway. After talking with Ms. Hodge, Ms. Watson, and Mr. Sprouse, Officer Justice broadcast a description to other officers on his walkie-talkie of a black male wearing a white t-shirt and dark pants who had fled on foot down the alley.

Within five minutes of Officer Justice's broadcast of the description, Spindale Police Officer Glen Harmon saw a person fitting the description in front of the Methodist Church on Main Street, roughly two blocks from the beauty salon, walking toward the rear of the church with a soft drink in his hand. Officer Harmon met the person, the defendant, at the back gate of the church and told him that he fit the description of a suspect in a vehicle breaking and entering that had just occurred uptown and that defendant "needed to just stay right there for a second" while he radioed Officer Justice to come. Officer Harmon then told defendant that he needed to search him for weapons and asked defendant if he was carrying any weapons.

Defendant said he had no weapons and had nothing to do with a breaking and entering; then, beginning to get upset, defendant emptied his pockets and threw the contents on the ground, saying, "Search me, search me." Officer Harmon recognized defendant as a suspect in the Hamrick murder which had occurred the day before.

At this point at 9:15 p.m., Officer Justice arrived; he too recognized defendant as a suspect in the murder case. Officers Harmon and Justice put defendant in the back of a patrol car and radioed for another officer to pick up Ms. Watson from the beauty shop and bring her to the Methodist Church to see if she could identify defendant as the person she had observed outside her shop. It took "several minutes" for Ms. Watson to be brought to the Methodist Church. When she arrived the officers shined a flashlight on defendant in the back of the patrol car, and she identified defendant as the person she had seen going back and forth in front of the salon. Defendant then remained in the back of the patrol car at the Methodist Church for about thirty more minutes while the officers conferred with the Assistant Chief of Police on what to do with defendant since he was also a suspect in the Hamrick murder case.

At 10:11 p.m. Officer Justice drove the patrol car with defendant in the backseat back to the beauty shop area so that Mr. Sprouse could see if defendant was the person he had seen pick up the cement block and then later run through the alley. Defendant was kept in the backseat of the patrol car, and the officers shined a flashlight on him so that Mr. Sprouse could identify him. Mr. Sprouse could not identify defendant's face but did indicate that defendant's clothes were of the same type as the clothes on the person he had seen. Defendant was then told he was under arrest and was transported to the police station, arriving there at 10:37 p.m.

Defendant was booked at the station, and his clothes were taken for possible evidence of glass fragments from the automobile window. Defendant was then transported at about 11:00 p.m. to a magistrate and charged with breaking and entering a motor vehicle. The magistrate, who was the same magistrate who had earlier that evening issued a warrant for police to search defendant's house for evidence in the Hamrick murder investigation, set bond in the amount of $100,000 on the breaking and entering charge. Defendant was then fingerprinted and taken to the Rutherford County jail, arriving sometime between 11:30 p.m. and 12:00 a.m. At 1:20 a.m. SBI Special Agents Bruce Jarvis and Andy Cline questioned defendant

about evidence linking defendant to the Hamrick murder; it was during this questioning that defendant made the statements which he now contends should have been suppressed.

[1] Defendant first argues that the trial court erred in concluding that Officer Harmon possessed sufficient factual justification for detaining defendant as defendant walked past the Methodist Church. In *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889 (1968), the United States Supreme Court recognized the right of a law enforcement officer to detain a person for investigation of a crime without probable cause to arrest him if the officer can point to specific and articulable facts that, with inferences from those facts, create a reasonable suspicion that the person has committed a crime. *State v. Lovin*, 339 N.C. 695, 703, 454 S.E.2d 229, 234 (1995). As the United States Supreme Court has stated:

> "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response."

*State v. Jackson*, 302 N.C. 101, 105, 273 S.E.2d 666, 670 (1981) (quoting *Adams v. Williams*, 407 U.S. 143, 145, 32 L. Ed. 2d 612, 616-17 (1972)).

Here, Officer Justice received information from Ms. Watson that around the time that the automobile was broken into, a tall black male with dark pants and a white t-shirt had been acting suspiciously nearby; Officer Justice also received information from Mr. Sprouse that, at about the same time, a black male wearing dark pants and a white t-shirt had picked up a cement block and walked toward the location of the automobile and then, moments later, had run down an alleyway. Officer Harmon received a transmission from Officer Justice to be on the lookout for a tall black male wearing a white t-shirt and black pants who was seen on foot at a certain location and moving in a certain direction. Officer Harmon saw a person fitting the description just moments later and within two blocks of the location specified.

We hold from these facts that the proximity in time and location and the accuracy of the physical description of the race, gender, and clothing of the suspect gave the officers reasonable suspicion to

make an investigative stop of defendant. *See State v. Lovin*, 339 N.C. at 703-04, 454 S.E.2d at 234 (reasonable suspicion existed, even though there was no witness to crime itself, where police had description of person seen driving victim's car as having "a lot of hair," a gold watch and large frame glasses; information about where the car was headed; and information that the person acted suspiciously); *State v. Rinck*, 303 N.C. 551, 558-60, 280 S.E.2d 912, 919-20 (1981) (reasonable basis for directing defendants to stop existed where, while there was no witness to the homicide, two men were seen acting suspiciously at victim's house late at night and, within about thirty minutes of the homicide, were seen walking along the road within two hundred feet of victim's house); *State v. Buie*, 297 N.C. 159, 162, 254 S.E.2d 26, 28 (reasonable grounds to stop defendant where woman reported intruder in motel room at 4:10 a.m. and gave description to police of a black male wearing dark clothing, approximately 5' 11" tall and weighing about 190 pounds, and where twenty minutes after the report and five to ten minutes after a radio transmission of the description, an officer saw defendant near the scene of the crime, wet, as if he had been running or perspiring heavily, and wearing a gold-colored leisure suit), *cert. denied*, 444 U.S. 971, 62 L. Ed. 2d 386 (1979).

[2] Defendant next argues that even if the initial stop was properly and lawfully based on reasonable suspicion, the nature and length of the detention of defendant, that is, secured in a patrol car from shortly after 9:15 p.m. until 10:11 p.m., exceeded the permissible scope of an investigative stop without probable cause. We disagree with defendant's argument and hold that the length and nature of the detention was reasonable since probable cause was in fact established shortly after the stop.

The Fourth Amendment requires that an investigatory stop be brief and that officers pursue an investigation in a diligent and reasonable manner to confirm or dispel their suspicion quickly. *United States v. Sharpe*, 470 U.S. 675, 686, 84 L. Ed. 2d 605, 615-16 (1985). Defendant notes that absent probable cause to arrest, the United States Supreme Court has never permitted a detention as intrusive as the hour-long detention of defendant in the patrol car. In this case, however, the officers diligently and reasonably pursued the investigation and quickly succeeded in receiving confirmation of defendant's identity, which raised the level of suspicion that defendant committed the breaking and entering from reasonable suspicion to probable cause.

At or slightly after 9:15 p.m., defendant was made to sit in the patrol car. He was not handcuffed. The record shows that defendant sat in the patrol car for a short period of time, "several minutes," while the officers waited for Ms. Watson to arrive and identify defendant. When Ms. Watson arrived, she identified defendant as the person she had seen in front of the beauty shop. We conclude that the identification made by Ms. Watson, in conjunction with Mr. Sprouse's description, provided the officers with probable cause to believe that defendant was the person who committed the breaking and entering of Ms. Hodge's vehicle.

The existence of probable cause depends upon "whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."

*State v. Bright*, 301 N.C. 243, 255, 271 S.E.2d 368, 376 (1980) (alterations in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145 (1964)). Mr. Sprouse's information about a black male wearing dark pants and a white t-shirt who picked up a cement block and walked toward the beauty shop and then later ran down an alley strongly links a person of that description to the crime; Ms. Watson's information about seeing a black male in a white t-shirt and dark pants acting suspiciously in front of her shop links that person to the person seen by Mr. Sprouse at about the same time; defendant, who fit the description, was then stopped within two blocks of the crime scene and fifteen minutes of the report of the crime; finally, Ms. Watson's identification of defendant as the person she saw in front of her shop completed the link between defendant specifically and the breaking and entering.

We have compared the facts and circumstances of this case to the facts and circumstances in other cases on this issue; and we conclude that when the officers received the confirmation of Ms. Watson's identification, they possessed reasonably trustworthy information sufficient to warrant a reasonable belief that defendant had committed the breaking and entering and that there was thus probable cause to arrest defendant. This Court has previously held that an officer was provided with probable cause prerequisite to a lawful arrest based on "the proximity of defendant to the location where the offenses were committed and the similarity of defendant's appearance to the description which had been reported to the police." *State*

*v. Wrenn*, 316 N.C. 141, 147, 340 S.E.2d 443, 447 (1986). In *Wrenn* this Court held that probable cause existed where a burglary report was received at 3:24 a.m. describing the suspect as a white male dressed in dark clothing, possibly wearing a knit hat and armed with a handgun, and where approximately two minutes after receiving the call, an officer saw a vehicle being driven by a white male wearing dark clothing. *See also State v. Joyner*, 301 N.C. 18, 21-22, 269 S.E.2d 125, 128-29 (1980) (probable cause to arrest existed where burglary/rape victim described suspect as black male with facial hair, wearing a toboggan and a green or blue jogging suit with white stripes, and where an officer saw the defendant, who matched the description, three and a half blocks from the crime scene and seven to ten minutes after the commission of the offenses); *State v. Bright*, 301 N.C. at 255-56, 271 S.E.2d at 377 (probable cause existed based on abduction victim's description of the abductor and his vehicle, combined with information from bowling alley employees that the defendant matched the description and was seen in the bowling alley prior to the abduction, and observation by officers that the defendant and his vehicle matched the victim's descriptions); *State v. Tippett*, 270 N.C. 588, 595, 155 S.E.2d 269, 274-75 (1967) (probable cause to arrest existed where burglary victim described suspect as a barefooted white male, not a blond, wearing rough work clothes, and where police, upon arriving at the scene at 1:19 a.m., saw a barefooted male who eluded them and then later, at 3:00 or 3:30 a.m., was seen hiding behind a bush two blocks from the scene of the crime).

Finally, defendant argues that the statements he made to the SBI agents and the property recovered based on those statements should not have been admitted since they were fruits of the illegal seizure or unlawful arrest. Since we have held that there was no illegal seizure or unlawful arrest, this argument necessarily fails. *State v. Lovin*, 339 N.C. at 704, 454 S.E.2d at 235.

**[3]** Defendant next contends that the trial court erroneously admitted into evidence other statements and evidence procured by the SBI after defendant invoked his constitutional right to remain silent, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Defendant's argument cannot succeed, however, since the record discloses that defendant never requested that interrogation cease.

Pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378 (1981),

the Fifth and Fourteenth Amendments require that during custodial interrogation, if the individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74, 16 L. Ed. 2d at 723; *Edwards*, 451 U.S. at 482, 68 L. Ed. 2d at 384. A defendant may terminate custodial interrogation by indicating in any manner that he wishes to remain silent. *State v. Murphy*, 342 N.C. 813, 823, 467 S.E.2d 428, 434 (1996).

In this case at the end of the first portion of defendant's interrogation, at about 4:00 a.m. on 19 August 1994, defendant made a statement that after he had gotten some sleep he would be willing to take the officers to the place where he had thrown some purses he had stolen from breaking into vehicles. The agents concluded the interview and returned defendant to his cell. Shortly thereafter, the agents learned that other officers had recovered two additional rings which belonged to the victim, one from defendant's home and the other from a pawn shop. At 4:20 a.m. they resumed their interrogation of defendant, whereupon defendant made the second portion of his statement.

Defendant asserts that his statement to the officers that he would show them where the purses were once he had gotten some sleep constituted an invocation of his constitutional right to have the interrogation cease. At the hearing on the motion to suppress, the trial court found the following facts: defendant received his *Miranda* warnings and willingly spoke with the agents, he voluntarily signed the interview sheet and *Miranda* form, he did not appear intoxicated or under the influence of drugs or alcohol, the agents concluded the first portion of the interview at approximately 4:00 a.m., within twenty minutes the agents learned that other officers recovered rings belonging to the victim, the agents then resumed their interview of defendant, the interview continued until 6:10 a.m., defendant remained alert and at times emotional, and defendant did not ask for an attorney and did not ask that the interview end.

These findings are binding since they are supported by competent evidence in the record, *State v. Jackson*, 308 N.C. 549, 581-81, 304 S.E.2d 134, 152 (1983); and we agree with the State that the trial court committed no constitutional error in admitting the evidence from defendant's second statement. In *State v. Murphy* this Court concluded that the defendant invoked his Fifth Amendment right to silence when he stood up and stated, "I got nothing to say." *State v. Murphy*, 342 N.C. at 822, 467 S.E.2d at 433. We reasoned that

the defendant's conduct, in abruptly standing up, combined with his unambiguous statement, "I got nothing to say," were clear indicators that he wished to terminate the interrogation and invoke his right to remain silent. The defendant similarly had indicated a desire to end two prior interrogations by standing up. . . . Finally, the fact that the interrogating officers immediately ceased the interrogation and took the defendant to be "booked" makes it equally clear that the officers understood that the defendant was terminating the interrogation and invoking his right to remain silent.

*Id.* at 823, 467 S.E.2d at 433-34. Here, by contrast, and contrary to defendant's arguments, defendant made no statement or gesture suggesting that he wished the interrogation to cease. His statement to the officers that he would be willing to take them to where he had discarded some stolen property after he had gotten some sleep was not an invocation of his Fifth Amendment rights. Thus, it was not error for the trial court to admit into evidence defendant's subsequent statement or the fruits of that statement.

## JURY SELECTION

Defendant next assigns error to the trial court's supervision of jury *voir dire*, specifically contending that the trial court (i) failed to prohibit the State from staking out prospective jurors with respect to whether they could vote for the death penalty in this case, (ii) failed to prohibit the State from staking out prospective jurors with respect to whether they could weigh aggravating circumstances more heavily than mitigating circumstances, and (iii) prohibited defendant from asking questions of a prospective juror permitted by the United States Constitution under *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992). Defendant contends that the trial court's conduct in these three instances permitted the State to select a jury that would tend to disregard mitigating evidence and automatically vote for the death penalty.

Defendant's arguments concerning jury selection are not persuasive. The trial court properly controlled *voir dire* questioning during jury selection, did not allow the prosecutor to stake out prospective jurors, and did not deny defendant the opportunity to question a prospective juror in accordance with *Morgan*. We have previously outlined the fundamental law on jury selection:

"The primary goal of the jury selection process is to ensure selection of a jury comprised only of persons who will render a fair

and impartial verdict." *State v. Locklear*, 331 N.C. 239, 247, 415 S.E.2d 726, 731 (1992). Pursuant to N.C.G.S. § 15A-1214(c), counsel may question prospective jurors concerning their fitness or competency to serve as jurors to determine whether there is a basis to challenge for cause or whether to exercise a peremptory challenge. N.C.G.S. § 15A-1214(c) (1988). The trial judge has broad discretion to regulate jury *voir dire*. *State v. Lee*, 335 N.C. 244, 268, 439 S.E.2d 547, 559, *cert. denied*, [513] U.S. [891], 130 L. Ed. 2d 162 (1994). "In order for a defendant to show reversible error in the trial court's regulation of jury selection, a defendant must show that the court abused its discretion and that he was prejudiced thereby." *Id.* The right to an adequate *voir dire* to identify unqualified jurors does not give rise to a constitutional violation unless the trial court's exercise of discretion in preventing a defendant from pursuing a relevant line of questioning renders the trial fundamentally unfair. *Morgan v. Illinois*, 504 U.S. 719, 730 n.5, 119 L. Ed. 2d 492, 503 n.5 (1992); *Mu'Min v. Virginia*, 500 U.S. 415, 425-26, 114 L. Ed. 2d 493, 506 (1991).

*State v. Fullwood*, 343 N.C. 725, 732-33, 472 S.E.2d 883, 886-87 (1996), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 339 (1997). The trial court may refuse to allow counsel to ask questions that use hypothetical evidence or scenarios to attempt to "stake-out" prospective jurors and cause them to pledge themselves to a particular position in advance of the actual presentation of the evidence. *State v. Larry*, 345 N.C. 497, 509, 481 S.E.2d 907, 914, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 234 (1997); *State v. Robinson*, 339 N.C. 263, 271-73, 451 S.E.2d 196, 202 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995).

[4] In the instant case during jury selection, the trial court overruled defendant's objection to the following question when asked of three prospective jurors by the prosecutor:

Assuming that you were on a jury which has found the defendant guilty of First Degree Murder, if that jury then at the sentencing phase, finds the existence of aggravating factors and finds that those factors outweigh any mitigating factors, and further finds that the aggravating factors are sufficiently substantial so as to call for the imposition of the death penalty, could that be your verdict in this case which would result in a judgment of death being imposed?

Defendant did not object when the question was asked of thirty-three other prospective jurors. This question by the prosecutor simply attempts to determine from the jurors whether they can follow the law in imposing the death penalty. The question does not presume evidentiary facts, nor does it require that the jurors pledge themselves to a position under any given set of evidentiary facts. The trial court did not abuse its discretion in overruling defendant's objection to the prosecutor's question.

[5] The prosecutor was also permitted to ask the jurors the following question:

> Q. There are a couple of other things I'd like to talk about and make sure that everybody understands the concept about the sentencing phase. We've talked about these aggravating and mitigating factors that you may hear evidence about. Aggravating factors are set out by the legislature, there's a green book that we all read and there are only eleven possible aggravating factors that the state can rely on in any capital case. I believe that if we get to that stage in this case that we may have evidence of two aggravating factors. The legislature has also set out a listing of mitigating factors, but the last one of those is any other factor that the jury considers to be or to have mitigating value; so there literally is an unlimited number of mitigating factors and I would predict that if we get into a sentencing phase in this case that there may be many mitigating factors submitted for your consideration by the defense but the state will be limited by the law to only two in this particular case. So, as we all talked earlier, that's why we're talking about this concept of the weight or the significance that one factor might have. Do all of you agree that, just hypothetically, one factor might have more weight or substance or importance than two or more of another factor, does everybody understand that concept? If you don't, please raise your hand and I'll try in my inarticulate way to explain it, does everybody understand that?

> (Affirmative responses.)

> Q. Is there any one of you jurors who feels like that if one side or the other has a greater number, simply more factors than the other side that side would necessarily have more weight or would be the winning side, does anybody feel that way?

> (Negative responses.)

Q. In other words, does everyone agree that it might be possible that there might be two aggravating circumstances and that those might yet outweigh or be more significant and more substantial than a greater number of mitigating circumstances? Everybody agree with that concept, that that's possible?

(Affirmative responses.)

Later, the prosecutor asked another panel of prospective jurors, "[D]o all of you understand that this is not a numbers game, that just because one side might get ten and another side might only have two, it's the weight and the significance and the substance of the factors that count, does everybody understand that concept?" These inquiries by the prosecutor do not, as defendant contends, stake the jurors to the proposition that they would weigh aggravating circumstances more heavily than mitigating circumstances. Rather, the questions ask the jurors if they can weigh the significance of the aggravating and mitigating circumstances rather than the relative number of aggravators and mitigators. As such, the questions simply ask the jurors if they can follow the long-settled law. *See State v. Goodman*, 298 N.C. 1, 34-35, 257 S.E.2d 569, 590 (1979) ("It must be emphasized that the deliberative process of the jury envisioned by [N.C.G.S. §] 15A-2000 is not a mere counting process. . . . Nuances of character and circumstance cannot be weighed in a precise mathematical formula."). We note also that defendant did not object to these questions from the prosecutor. The trial court did not err by not intervening *ex mero motu*.

[6] The defense attempted to ask prospective juror Rowlette the following question after the juror had indicated he thought the death penalty would be appropriate if a murder was heinous:

Q. So if the state proved an aggravating factor or more than one aggravating factor and if the state proved that one of the aggravating factors in this case was especially heinous, atrocious, and cruel, that is an aggravating factor; and then if the defendant introduced evidence of a mitigating factor or factors and you were sitting on the jury and you found those, and in the third step if you were on this jury and your jury found that the aggravating factor or factors outweighed the mitigating factors, we're still going along with this hypothetical, and then if you finally came to that last step that the Judge just outlined and you were weighing whether the aggravating factors outweighed the mitigating factors and also you were deciding whether the aggravating factors,

when taken into consideration and along with the mitigating were sufficiently substantial to call for the death penalty, that's a lot of words, but if you were to do that, if you were called to do that and the aggravating factor that you had found was heinous, atrocious and cruel, would you automatically vote for the death penalty?

The trial court disallowed the question on the grounds that it improperly created a hypothetical scenario positing a specific finding of the heinous, atrocious, or cruel aggravating circumstance, such that the question would tend to stake the juror to a certain position under that set of facts. The trial court correctly determined that this question is impermissible. " 'Counsel should not fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by which the juror should be guided. . . . Jurors should not be asked what kind of verdict they would render under certain named circumstances.' " *State v. Robinson*, 339 N.C. at 273, 451 S.E.2d at 202 (quoting *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980)). In *Robinson* the defendant attempted to ask prospective jurors if they would be able to follow the trial court's instructions and weigh aggravating and mitigating circumstances and still consider life imprisonment as an option even though defendant had a previous conviction for first-degree murder. *Id.* at 272, 451 S.E.2d at 201-02. We concluded that the question in *Robinson* attempted to " 'stake out' the jurors as to their answers to legal questions before they are informed of legal principles applicable to their sentencing recommendation." *Id.* at 273, 451 S.E.2d at 202. Our analysis in *Robinson* is equally applicable here:

> The question posed [in *Robinson*] does not amount to a proper inquiry as to whether the juror could follow the law as instructed by the trial judge. Rather, the question is an attempt to determine whether or not a juror will be unable to consider a life sentence once he or she learns that defendant had been convicted of a prior murder.

*Id.* (citation omitted). Here, defendant has attempted to find out from the juror what verdict the juror would render given the finding of a particular aggravating circumstance.

Defendant contends that his question to the juror constituted a proper attempt, pursuant to *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, to determine whether the juror would automatically vote for the death penalty without regard for mitigating circumstances. But *Morgan* does not require that defendant be allowed to

ask a juror what his or her position would be given a particular aggravating circumstance. *State v. Kandies*, 342 N.C. 419, 441, 467 S.E.2d 67, 78, *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 167 (1996); *State v. Lynch*, 340 N.C. 435, 452, 459 S.E.2d 679, 686 (1995), *cert. denied*, 517 U.S. 1143, 134 L. Ed. 2d 558 (1996).

Moreover, even if we did not hold that this particular question by defense counsel crossed the line from a proper *Morgan* inquiry as to whether a juror would automatically vote for the death penalty to an improper stake-out question, defendant could establish neither prejudice nor a violation of fundamental fairness. The trial court allowed defendant's challenge for cause to remove prospective juror Rowlette after subsequent questioning exposed this juror's possible inability to be impartial and consider mitigating circumstances. Thus, defendant was not forced to accept an undesirable juror. *See State v. Miller*, 339 N.C. 663, 681, 455 S.E.2d 137, 147, *cert. denied*, 516 U.S. 893, 133 L. Ed. 2d 169 (1995).

In sum, we hold that the trial court committed no error in its supervision of jury *voir dire* which would have resulted in a jury biased in favor of the death penalty.

Defendant next assigns error to the trial court's overruling of defendant's objections to the State's impermissible use of peremptory challenges to strike from the jury three black prospective jurors, Greene, Hudson, and Watkins, solely on account of their race. Article I, Section 26 of the Constitution of North Carolina prohibits the use of peremptory challenges for racially discriminatory reasons, *Kandies*, 342 N.C. at 434, 467 S.E.2d at 74, as does the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986).

In *Batson* the United States Supreme Court established a three-part test to determine if the prosecutor has engaged in impermissible racial discrimination in the selection of jurors. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). First, the defendant must establish a *prima facie* case that the prosecutor has exercised a peremptory challenge on the basis of race. *Id.* Second, once the *prima facie* case has been established by the defendant, the burden shifts to the State, which, in order to rebut the inference of discrimination, must offer a race-neutral explanation for attempting to strike the juror in question. *Id.*; *State v. Gaines*, 345 N.C. 647, 668, 483 S.E.2d 396, 408, *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 177 (1997). The explanation must be clear and reasonably specific, but

" 'need not rise to the level justifying exercise of a challenge for cause.' " *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990) (quoting *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88). In stating the race-neutral reason for the peremptory challenge, the prosecutor is not required to provide an explanation that is persuasive or even plausible. The issue at this stage is the facial validity of the prosecutor's explanation; and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. *State v. Barnes*, 345 N.C. 184, 209-10, 481 S.E.2d 44, 57, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 134 (1997). Our courts also permit the defendant at this point to introduce evidence that the State's explanations are merely a pretext. *State v. Gaines*, 345 N.C. at 668, 483 S.E.2d at 408; *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991).

Third, and finally, the trial court must make the ultimate determination as to whether the defendant has carried his burden of proving purposeful discrimination. *Hernandez v. New York*, 500 U.S. at 359, 114 L. Ed. 2d at 405; *State v. Gaines*, 345 N.C. at 668, 483 S.E.2d at 408. As this determination is essentially a question of fact, the trial court's decision of whether the prosecutor had a discriminatory intent is to be given great deference and will be upheld unless the appellate court is convinced that the trial court's determination is clearly erroneous. *Kandies*, 342 N.C. at 434-35, 467 S.E.2d at 75. " 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *State v. Thomas*, 329 N.C. 423, 433, 407 S.E.2d 141, 148 (1991) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528 (1985)).

[7] With respect to prospective juror Greene, defendant makes four arguments—one on procedural grounds and three of a more substantive nature—that the trial court erred when it failed to find that the State's peremptory strike was the result of purposeful discrimination. First, defendant contends that the trial court erroneously concluded its analysis upon finding that the State's proffered reason was race-neutral and failed to address the ultimate question of whether defendant had proven racial discrimination. Defendant argues that under these circumstances, there is no factual finding by the trial court on the ultimate issue, and thus no factual finding which is entitled to deferential review by this Court. We conclude, however, that in all practicality, the trial court made a sufficient ultimate determination, finding no purposeful racial discrimination, when it denied defendant's *Batson* motion and entered the conclusion of law that the pros-

ecutor's reasons for excusing Mr. Greene, his expressed lack of confidence in the court system and his prior record, were "race-neutral and sufficient to justify the peremptory challenge." This conclusion by the trial court effectively reached the ultimate issue: whether there was purposeful racial discrimination in the peremptory strike of Mr. Greene. We cannot say that the trial court's determination was clearly erroneous. *State v. Lyons*, 343 N.C. 1, 14, 468 S.E.2d 204, 210, *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 167 (1996).

[8] Second, defendant argues that the trial court erred when it did not find racial discrimination in the strike of prospective juror Greene in that it did not discount the persuasiveness of the prosecutor's explanation as to Mr. Greene in light of the impermissibly race-based rationale given for prospective juror McKinney, the other black male in the same jury panel. The first jury panel at defendant's trial consisted of nine white prospective jurors and three African-American prospective jurors, two of whom were male. The prosecutor proposed to accept the black female juror but exercised his first two peremptory challenges to strike the only two black males, Mr. Greene and Mr. McKinney. Defendant made a *Batson* objection to the two strikes; and the trial court found a *prima facie* case of potential racial discrimination, requiring that the State explain its rationale for excusing the two. The prosecutor offered in explanation that Mr. Greene "said that he thought that the criminal justice system was flawed" and that "he expressed serious reservations about the system and indicated that he thought in many instances it was unfair and I believe he stated that it would be difficult for him to be a part of this system although he could do so, and he stated more than once that he wants to change the system." This explanation is sufficiently supported by the record in the exchange that took place between the prosecutor and Mr. Greene after Greene indicated he had been a defendant in a DWI case:

> Q. The jury is a very integral part of the system and the whole system breaks down without jurors, is there any one of you that holds such negative feelings about the court system that you feel like you just could not in good faith and good conscience be a part of this process? Mr. Greene, do you have such feelings as that?
>
> A. I feel that the justice system is unfair and I have felt that way for some time but I can't change it, but I've seen things in the past that leads me to believe that the justice system is unfair.

Q. Mr. Greene, would your beliefs in that regard do you think interfere with your ability to be a fair and impartial juror in this case?

A. No, sir.

Q. You don't think—

A. No.

Q. Do you harbor some prejudice or ill feeling about the court system and the people who work in it?

A. I just want it to change so it's more fair.

In its findings of fact, the trial court stated: "The Court finds that Mr. Greene has previously been convicted of a misdemeanor and expressed a significant degree of dissatisfaction with the court system. The Court would characterize [Mr. Greene's] expressed attitude towards the court system as hostile." The court concluded that the reasons given to excuse Mr. Greene, his expressed lack of confidence in the court system and his prior record, were racially neutral and sufficient to justify the peremptory challenge.

With respect to prospective juror McKinney, however, the State's explanation for its strike was as follows:

Your Honor, the state would excuse Mr. McKinney primarily because of his acknowledgment in [sic] an association that associates in many instances with being anti-law enforcement and which to my knowledge sponsors and funds a legal defense fund which frequently files briefs in death penalty cases. This man claims to be a member of that organization [namely, the NAACP] and says that it does not take any position on the death penalty and I take issue with that and that is my reason for excusing him from the jury. . . . He's a member of an organization which I strongly associate with being anti-state and anti-death penalty.

The trial court made the following findings of fact with respect to prospective juror McKinney:

12. After being asked to articulate race neutral reasons for excusing the jurors, the state indicated that Mr. McKinney would be excused because he was a member of the National Association for the Advancement of Colored People (NAACP) which, according to the state, had filed *amicus* briefs and otherwise opposed the death penalty.

13. During voir dire, Mr. McKinney indicated that he did not know the position of the NAACP regarding the death penalty and that he did not personally oppose the death penalty.

14. When asked to articulate a race neutral reason to excuse Mr. McKinney, the prosecutor did not immediately offer said reason, but supplied his rationale only after studying Mr. McKinney's juror information sheet at length.

The trial court concluded that the prosecutor's professed reason to excuse Mr. McKinney was "not sufficient to overcome the presumption of discrimination nor was it race neutral," and that it "appeared to the Court to be somewhat pretextual and an after thought." The trial court thus proposed to discard the entire jury panel as the proper means of remedying the discriminatory use of this peremptory challenge. The State at this point elected to withdraw its challenge of Mr. McKinney, and so accepted him as a juror. The court then concluded that the State's withdrawal of its challenge remedied the *Batson* violation with respect to the strike of Mr. McKinney.

Relying on *Gamble v. State*, 257 Ga. 325, 327, 357 S.E.2d 792, 795 (1987), defendant argues that in light of the finding of racial discrimination in the strike of Mr. McKinney, the trial court erred in not finding racial discrimination in the strike of Mr. Greene as well. Defendant contends the finding of racial discrimination as to Mr. McKinney diminished the persuasive value of the State's explanation as to Mr. Greene. From the record in this case, we cannot say that the trial court failed to consider the impermissible strike in evaluating the challenge to Mr. Greene. First, the trial court appears to have considered the State's explanations as to Mr. Greene and Mr. McKinney together, as evidenced by defendant's unified objection to the strikes and the trial court's single order on the matter. Second, the *prima facie* case as to Greene and McKinney was not particularly strong, given that one black prospective juror from the first panel was in fact already accepted and placed on the jury. Finally, the trial court may well have discounted the persuasiveness of the explanation as to Mr. Greene to the extent warranted by the rejected explanation as to Mr. McKinney. Peremptorily striking a prospective juror based upon membership in the NAACP has been held to be race-neutral and not unconstitutionally discriminatory. *See United States v. Payne*, 962 F.2d 1228, 1233 (6th Cir.), *cert. denied*, 506 U.S. 909, 121 L. Ed. 2d 229 (1992). The trial judge's determination as to the McKinney strike was predicated as much upon the manner in which the explanation was

made as upon the substance of the explanation. When asked to artic-ulate his race-neutral reason, the prosecutor could not do so imme-diately, but had to study Mr. McKinney's juror information sheet at length before supplying his rationale, making the explanation appear to the court to be "somewhat pretextual and an after thought." There was no similar hesitation with respect to prospective juror Greene. For these reasons, given the strength of the rationale for striking Mr. Greene, we conclude that the trial court did not commit clear error in finding no intentional racial discrimination in the strike of Mr. Greene.

[9] Defendant next argues as to the strike of prospective juror Greene that the prosecutor asked black prospective jurors questions designed to provoke disqualifying responses while not asking such questions of white prospective jurors and that this disparate exami-nation was a basis for finding intentional racial discrimination. Specifically, defendant contends that the prosecutor directed multi-ple questions to Mr. Greene involving whether he thought the crimi-nal justice system was "unfair" or did not treat people the way they should be treated. After a thorough review of the record, we con-clude that the prosecutor questioned many prospective jurors, irre-spective of race, on their beliefs and feelings about the fairness of the judicial system. The questions were often varied in form, but the same basic information was sought in each case. The trial court did not commit clear error on this ground. Disparate questioning of prospective jurors does not necessarily give rise to *Batson* error. *Thomas*, 329 N.C. at 432, 407 S.E.2d at 147-48.

[10] Finally, as to the strike of prospective juror Greene, defendant argues that the State accepted other jurors, who were white, even though they expressed some reservations about the fairness of the judicial system, yet struck Greene. Defendant contends that differen-tiation shows purposeful racial discrimination. The acceptance by the State of white prospective jurors similarly situated to black prospective jurors who have been peremptorily stricken is a factor to be considered in determining whether there has been purposeful racial discrimination. *Kandies*, 342 N.C. at 435, 467 S.E.2d at 75; *Robinson*, 330 N.C. at 19, 409 S.E.2d at 298. But defendant's approach in this argument, like that taken by the defendants in both *Robinson* and *Porter*, 326 N.C. at 501, 391 S.E.2d at 152, "involves finding a sin-gle factor among [the] several articulated by the prosecutor . . . and matching it to a passed juror who exhibited that same factor." *Robinson*, 330 N.C. at 19, 409 S.E.2d at 298. As we have said previ-

ously, "This approach 'fails to address the factors as a totality which when considered together provide an image of a juror considered . . . undesirable by the State.' " *Id.* (quoting *Porter*, 326 N.C. at 501, 391 S.E.2d at 152). For these reasons we are unable to conclude that the trial court committed clear error in not finding that prospective juror Greene was peremptorily stricken for impermissible racially discriminatory reasons.

[11] Defendant next contends, with respect to the State's peremptory strikes of prospective jurors Hudson and Watkins, that the trial court erred in concluding that defendant had not established a *prima facie case* of racial discrimination by giving too much weight to the presence of black jurors already on the jury. Defendant argues specifically that the trial court's methodology was flawed in that it ignored all factors other than the number of black jurors remaining on the jury.

Our cases have held that one of the factors which a court must consider in determining whether intentional discrimination is present in a particular peremptory strike is whether the State has accepted any black jurors. *State v. Kandies*, 342 N.C. at 435, 467 S.E.2d at 75; *State v. Smith*, 328 N.C. 99, 121, 400 S.E.2d 712, 724-25 (1991). "[O]ne factor tending to refute a showing of discrimination is the State's acceptance of black jurors." *Thomas*, 329 N.C. at 431, 407 S.E.2d at 147. In the present case the State had accepted two black jurors when the prosecutor peremptorily challenged a black prospective juror, Mrs. Hudson. Defendant's *Batson* objection, in its totality, contained the following argument: "As to one of the jurors that's been excluded, that's Mrs. Hudson, the defendant objects at this point to her under the *Batson* case. At this point he's peremptorily excluded three jurors, now two of which are black. That's the extent of my argument." The court, in ruling that defendant had not made out a *prima facie* case with this argument, responded:

> The Court will find that we had a *Batson* hearing yesterday. At that point the prosecution was required to state race neutral reasons for excusing a juror. Pursuant to that hearing one juror [Mr. Greene] was excused after proper reasons were given. At this point the prosecution has accepted two black jurors [this includes Mr. McKinney], has excused one; if Mrs. Hudson is excused, that will be two out of four. I do not find that this raises the presumption required to make the prosecution state its reasons. There are sufficient black jurors remaining on the panel. I

**STATE v. FLETCHER**

[348 N.C. 292 (1998)]

will also note for the record, however, that Mrs. Hudson's answers to the questions are part of the record. She's indicated ambivalence towards the death penalty which may not rise to the level requiring the Court to excuse her for cause. The court has no doubt that if required to state a reason, the prosecution would be able to present a race neutral reason for excusing Mrs. Hudson. However, I'm not going to require him to do that because I do not formally find that at this point there is a pattern that requires that he do so.

This review of the record reveals that, first, defendant's objection itself was couched in terms of the number of black prospective jurors the prosecution had attempted to strike; so the court was merely responding in terms of the number of black jurors already seated on the jury.[1] Second, it is manifest from the rest of the court's response that it did not ignore all factors other than the number of blacks on the jury panel. Thus, with respect to prospective juror Hudson, we cannot say that the trial court committed clear error in not finding a *prima facie* case of racial discrimination.

Likewise, with prospective juror Watkins, the defense objected to the State's peremptory strike and offered the following rationale for its objection: "The objection is based on the fact that this is, it's obvious that this is a systematic exclusion of black jurors and he continues to do it, black male jurors." The following colloquy then took place between the court and defense counsel:

THE COURT: All right, there are two black jurors in the pool already seated, one who is male. I'm going on memory here, correct me if I'm wrong; is this the third [black juror] that will be excused?

MR. WILLIS: I believe it is the third.

THE COURT: If Mr. Watkins is excused, [the prosecutor] would have excused three out of five [black jurors], that's beginning to get to be a little bit troublesome, but the ruling of the Court will be that that's not sufficient to create a *prima faci*[e] showing of discrimination pursuant to *Batson* [v.] *Kentucky*.

1. Note that the State attempted to strike Mr. McKinney, but reinstated him on the jury after the trial court found purposeful racial discrimination in his strike, thus remedying the violation. This is why the State's argument that it had *accepted* two out of three black prospective jurors is not inconsistent with defendant's argument that the State *attempted to strike* two of three black prospective jurors.

Again, the defense invited the trial court's numerical analysis by alleging that the prosecution was carrying out a systematic exclusion of black jurors. While such an analysis is not dispositive, neither is it impermissible; this Court has on a number of occasions utilized a numerical or statistical analysis in determining whether a *prima facie* case of racial discrimination in jury selection exists. *See State v. Ross*, 338 N.C. 280, 285, 449 S.E.2d 556, 561-62 (1994) (minority acceptance rate of 66% failed to establish *prima facie* case of discrimination); *State v. Allen*, 323 N.C. 208, 219, 372 S.E.2d 855, 862 (1988) (minority acceptance rate of 41% failed to establish *prima facie* case of discrimination), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990); *State v. Abbott*, 320 N.C. 475, 481-82, 358 S.E.2d 365, 369 (1987) (acceptance rate of 40% failed to establish *prima facie* case of discrimination). In this case, at this point in jury selection, out of five prospective black jurors, two had been seated on the jury. In sum, we cannot say that the trial court committed clear error in finding no *prima facie* case of racial discrimination as to prospective jurors Hudson and Watkins.

Defendant next argues that the trial court should have considered the third step in the *Batson* analysis and found that the peremptory strike of both Hudson and Watkins was purposefully racially discriminatory. However, as the trial court found no *prima facie* case of discrimination as to this juror and as we have already found no error in that determination, we have no need to proceed to this issue. *State v. Smith*, 347 N.C. 453, 463, 496 S.E.2d 357, 363 (1998); *State v. Williams*, 343 N.C. 345, 359, 471 S.E.2d 379, 386-87 (1996), *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 618 (1997). The trial court in this case, as in *Williams* and *Smith*, explicitly ruled that defendant failed to make a *prima facie* showing: "I do not find that this raises the presumption required to make the prosecution state its reasons. . . . I'm not going to require [the prosecutor] to [present race-neutral reasons for excusing Mrs. Hudson] because I do not formally find that at this point there is a pattern that requires that he do so." The prosecutor then requested that the trial court allow him to state his reasons for the challenge: "We'd like to do so though if the Court has no objection. . . . Just for the record." Thus, the analysis, which we applied in *State v. Lyons*, 343 N.C. at 11-12, 468 S.E.2d at 208, and in *State v. Robinson*, 336 N.C. 78, 93, 443 S.E.2d 306, 312 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995), has no application here, where the trial court specifically ruled that there was no *prima facie* case of discrimination.

## GUILT-INNOCENCE PHASE

[12] Defendant next argues that the trial court committed prejudicial constitutional error in failing to intervene *ex mero motu* to correct the State's improper comment on defendant's failure to testify at trial. Defendant takes exception to the following language from the prosecutor's closing argument:

> That's what happened. Somebody just pulled that [storm] door open. Now do we know what happened to that glass? We don't. It's one of the many, many unanswered things about what happened there in that house that night. Two people know what happened in that house that night. One of them is dead. The other one is sitting right here. So I don't know.
>
> I wish I could answer all these questions. There are a bunch of them. I'm going to talk about some of them. But to think that we're going to come in here and be able to prove to you every single little teeny tiny fact of what happened is ridiculous, members of the jury. I hate to tell you this, but people don't go kicking down folks' doors and slitting their throats in front of a crowd of witnesses. It just doesn't happen.

The prosecutor later argued:

> By the very nature of coming in here and sitting here and pleading not guilty, the State has to prove everything and that's what [defendant] Mr. Fletcher has done. He's hid behind this presumption of justice for as long as he can. But it's gone now. Stripped away by the proof in this case, but we had to prove it to you, and we did.

Finally, at the sentencing hearing, the prosecutor argued:

> [Nonstatutory mitigating circumstance n]umber 10, the defendant, Andre Fletcher, has no recollection of committing the crime for which he has been convicted. I urge you to absolutely reject that statement and write "No" beside it. There is no evidence before you of what Mr. Fletcher remembers or does not remember at this moment in time.

Preliminarily, we note that defendant in this case did not object to any of these arguments; and where a defendant fails to object, an appellate court reviews the prosecutor's argument to determine whether the argument was "so grossly improper that the trial court

committed reversible error in failing to intervene *ex mero motu* to correct the error." *State v. Williams*, 317 N.C. 474, 482, 346 S.E.2d 405, 410 (1986). As we stated previously, "only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 160 (1996).

A criminal defendant may not be compelled to testify, and any reference by the prosecutor to a defendant's failure to testify violates the defendant's constitutional right to remain silent. *State v. Baymon*, 336 N.C. 748, 758, 446 S.E.2d 1, 6 (1994). A prosecutor may, however, properly argue the failure of the defendant to produce evidence. *State v. Richardson*, 342 N.C. at 785-86, 467 S.E.2d at 693; *State v. Young*, 317 N.C. 396, 415, 346 S.E.2d 626, 637 (1986). In this case the prosecutor's remarks were directed toward defendant's failure to offer evidence to rebut the State's case, not at defendant's failure to take the stand himself. The comments are not comparable to comments that have been held improper by this Court and the United States Supreme Court. In *Griffin v. California* the prosecutor argued to the jury, "The defendant certainly knows [the details of the crime]. . . . These things he has not seen fit to take the stand and deny or explain." *Griffin v. California*, 380 U.S. 609, 610-11, 14 L. Ed. 2d 106, 107-08 (1965). In *State v. Reid* the prosecutor said, "The defendant hasn't taken the stand in this case." *State v. Reid*, 334 N.C. 551, 554, 434 S.E.2d 193, 196 (1993). Defendant argues that the comments made by the prosecutor in this case are similar to those made in *Baymon*, where we held that the trial court erred in failing to grant the defendant's request for a mistrial. *Baymon*, 336 N.C. at 757-59, 446 S.E.2d at 6. The prosecutor there had said, "We don't know how many times the child was [sexually assaulted or abused]. . . . The defendant knows, but he's not going to tell you." *Id.* at 757, 446 S.E.2d at 6. We reasoned that "[t]he implication left by the prosecutor's argument was that defendant knows he is guilty of these and perhaps more assaults, but he is hiding behind his right not to take the stand to avoid admitting it so the jury must decide how many assaults actually occurred." *Id.* at 758, 446 S.E.2d at 6. This case is distinguishable from *Baymon* in that here the prosecutor made no reference, direct or indirect, as to defendant's failure to say anything. The comment that "the other one is sitting right there" is merely an argument that defendant is in fact the killer. The argument concerning unanswered

questions recognizes that the jury might have some unanswered questions which do not prevent the jury from finding defendant guilty beyond a reasonable doubt. Similarly, the argument that defendant pled not guilty and thereby required the State to prove the case, read in context, is an argument that the State has done what the State was required to do and that based on the evidence presented, defendant's presumption of innocence has been overcome. These arguments were not so grossly improper as to manifest extreme impropriety. *State v. Randolph*, 312 N.C. 198, 206, 321 S.E.2d 864, 869-70 (1984). The trial court did not err in failing to intervene *ex mero motu*.

## SENTENCING PROCEEDING

Defendant brings forth several issues for review with respect to his capital sentencing proceeding, but we need focus on only two of defendant's contentions.

**[13]** Defendant first argues that the trial court erroneously failed to submit to the jury the statutory mitigating circumstance that the capital felony was committed while defendant was under the influence of a mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2) (1997), and that he is, therefore, entitled to a new sentencing proceeding. Defendant did not request the submission of the (f)(2) mitigating circumstance at his sentencing proceeding; but where evidence is presented at a capital sentencing proceeding that may support a statutory mitigating circumstance, the trial court has no discretion as to whether to submit the circumstance. *State v. Skipper*, 337 N.C. 1, 44, 446 S.E.2d 252, 276 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). The trial court must submit the circumstance if it is supported by substantial evidence. *State v. McCarver*, 341 N.C. 364, 398-99, 462 S.E.2d 25, 44-45 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *State v. Fullwood*, 329 N.C. 233, 236, 404 S.E.2d 842, 844 (1991). In sum, the test for sufficiency of evidence to support submission of a statutory mitigating circumstance is whether a juror could reasonably find that the circumstance exists based on the evidence. *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990); *State v. Syriani*, 333 N.C. 350, 394, 428 S.E.2d 118, 142, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993).

In the present case defendant presented evidence from Dr. Anthony Sciara, a psychologist who evaluated defendant a number of times between his arrest and trial. Sciara testified that defendant

"tends to distort his perceptions and at times may even be out of touch with reality" and that under times of stress, "he may actually not perceive reality correctly and may deal with the world inappropriately." Sciara's testing indicated that defendant was in a "stress overload" situation at the time of trial and that it is likely that he had been in a chronic stress overload situation "for a very long time." Sciara indicated that his findings from psychological testing were consistent with defendant's records beginning ten years before the murder, when defendant was ten years old. Sciara also found that defendant was abusing marijuana and, at times, cocaine. Sciara testified that the best indicator of violent behavior in a person is a history of violence, of which defendant had none. Sciara testified that in defendant's case,

> [t]o do the killing as indicated[,] something very different would have had to [have] gone on. He would have had to be in a very psychotic state or really out of it on drugs. Either one of those might have led to this behavior, because then the predictions of doing the consistent thing that he did would be out the window.

The State contends, citing *State v. Geddie*, 345 N.C. 73, 102-03, 478 S.E.2d 146, 161 (1996), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 43 (1997), that there is no evidence in the record that defendant was stressed, on drugs, or otherwise out of touch with reality at the time of the killing. In *Geddie* this Court upheld the trial court's failure to submit the (f)(2) mitigator where defendant's psychologist "diagnosed defendant as a substance abuser and antisocial person," but "never testified to any mental disorder or emotional disturbance at the time of the killing." *Id.* at 103, 478 S.E.2d at 161. In this case, however, a juror could reasonably find from Dr. Sciara's testimony that, at the time of the killing, defendant was under the influence of a mental or emotional disturbance. First, Sciara testified that under times of stress, defendant might not perceive reality correctly and that it was likely that defendant had been in a stress-overload situation for a very long time based on his environment and psychological problems. Second, given defendant's lack of any violent history, Sciara testified that defendant would have had to have been "in a very psychotic state or really out of it on drugs" to attack and kill in the manner in which the victim was killed. We hold that this testimony is sufficient to link defendant's mental and emotional state to the time of the killing and that a reasonable juror could conclude from this evidence that defendant was under the influence of a mental or emotional disturbance at the time of the killing. For this reason the trial

court's failure to submit the (f)(2) mitigating circumstance to the jury was error.

[14] Defendant also argues that the trial court erroneously failed to submit to the jury the statutory mitigating circumstance that defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1). As above, defendant's failure to request the submission of the (f)(1) mitigating circumstance does not discharge the trial court from its duty to submit the circumstance if the evidence is sufficient for a juror to reasonably find that the circumstance exists. *State v. Jones*, 346 N.C. 704, 715, 487 S.E.2d 714, 721 (1997). The length of a defendant's criminal history, by itself, is not determinative for purposes of submitting the (f)(1) mitigator. "When the trial court is deciding whether a rational juror could reasonably find this mitigating circumstance to exist, the nature and age of the prior criminal activities are important, and the mere number of criminal activities is not dispositive." *Geddie*, 345 N.C. at 102, 478 S.E.2d at 161. In *State v. Jones* this Court held that the trial court erred in not submitting the (f)(1) circumstance where the defendant's criminal history consisted of four counts of misdemeanor larceny and two or three felony larceny charges and where there was no evidence presented at trial suggesting that defendant had committed any violent crimes prior to killing the victim. *Jones*, 346 N.C. at 716, 487 S.E.2d at 722. Our analysis in *Jones* emphasizes that the defendant's prior convictions consisted of property crimes rather than violent crimes. In that case we cited a number of cases in which we had previously held that similar histories permitted a rational juror to find as a mitigating circumstance that defendant had no significant history of prior criminal activity. *Id.* A common theme in those cases is the predominantly nonviolent nature of the prior crimes. *State v. Ball*, 344 N.C. 290, 310, 474 S.E.2d 345, 357 (1996) (the defendant had a history of drug use and a conviction for robbery; a conviction for felonious assault, after which altercation he took the victim to the emergency room; and three convictions for forgery), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 561 (1997); *State v. Rowsey*, 343 N.C. 603, 619-20, 472 S.E.2d 903, 911-12 (1996) (the defendant had illegally possessed marijuana and a concealed weapon; had been convicted of two counts of larceny, fifteen counts of injury to property, and an alcoholic beverage violation; and at the time of the trial, had been charged with five counts of felony breaking and entering and felony larceny offenses), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 221 (1997); *State v. Buckner*, 342 N.C. 198, 234, 464 S.E.2d 414, 434-35 (1995) (the defendant had

seven breaking and entering convictions; a common law robbery conviction in which defendant's co-conspirator, not the defendant, was the instigator or main actor; and a drug-trafficking conviction), *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 47 (1996); *State v. Lloyd,* 321 N.C. 301, 313, 364 S.E.2d 316, 324 (the defendant had two felony convictions which occurred almost twenty years previously and seven alcohol-related misdemeanor convictions), *sentence vacated on other grounds,* 488 U.S. 807, 102 L. Ed. 2d 18 (1988); *see also State v. Williams,* 343 N.C. 345, 371-72, 471 S.E.2d 379, 393-94 (1996) (the defendant's record consisted of convictions for misdemeanor larceny, two counts of misdemeanor breaking and entering, two counts of misdemeanor larceny, misdemeanor possession of stolen property, carrying a concealed weapon, possession of a weapon of mass destruction, uttering forged papers, misdemeanor assault on a female, and misdemeanor assault with a deadly weapon), *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 618 (1997); *State v. Walls,* 342 N.C. 1, 56, 463 S.E.2d 738, 767 (1995) (the defendant had convictions for driving while impaired, assault, communicating threats, escape, nonfelonious breaking and entering, receiving stolen goods, possessing a stolen vehicle, and possessing stolen credit cards), *cert. denied,* 517 U.S. 1197, 134 L. Ed. 2d 794 (1996); *State v. Frye,* 341 N.C. 470, 504, 461 S.E.2d 664, 681 (1995) (witnesses testified that the defendant used drugs extensively and had been incarcerated previously), *cert. denied,* 517 U.S. 1123, 134 L. Ed. 2d 526 (1996); *State v. Quick,* 337 N.C. 359, 362, 446 S.E.2d 535, 537 (1994) (the defendant had used drugs illegally and had been convicted of larceny, receiving stolen goods, and forgery); *State v. Mahaley,* 332 N.C. 583, 597, 423 S.E.2d 58, 66-67 (1992) (the defendant had no record of criminal convictions, and her prior criminal activities consisted of using illegal drugs and stealing money and credit cards to support her drug habit), *cert. denied,* 513 U.S. 1089, 130 L. Ed. 2d 649 (1995); *State v. Turner,* 330 N.C. 249, 257, 410 S.E.2d 847, 851 (1991) (the defendant had been convicted of misdemeanor offenses of receiving stolen goods, larceny, assault with a deadly weapon, and worthless check; the defendant's nonadjudicated acts included illegal possession of marijuana, theft when the defendant was a juvenile, sale of marijuana, and possession of a sawed-off shotgun).

In the present case the evidence tended to show that defendant had a history of stealing since he was a child and that he had been convicted of the following offenses since 1990: two counts of felonious breaking and entering, three counts of felonious larceny, felonious possession of stolen property, misdemeanor breaking and

STATE v. FLETCHER

[348 N.C. 292 (1998)]

entering, five counts of misdemeanor larceny, and assault on a female. While it is fair to say that defendant stole from others for most of his life and that in recent years he seems to have supported himself largely by stealing and occasionally selling drugs, no testimony was presented that the breaking and enterings and larcenies were connected to any violent behavior. The breaking and entering and larceny charges appear to have involved only unoccupied vehicles; there was no evidence prior to the killing of the victim in this case that defendant broke into anyone's home. Numerous witnesses testified that defendant's larcenous history is devoid of any violence, aggressive or physical behavior, or even confrontation with the victims of the larcenies. The State urges that a total life of crime such as defendant's forbids the submission of the (f)(1) mitigator to the jury and proffers language from our opinion in *State v. Sidden,* in which we held it was not error not to submit the (f)(1) mitigator where

> [t]he evidence showed the defendant had been dealing in the illegal sale of alcohol and drugs all his adult life. This evidence of constant criminal activity culminating in the murder of Garry Sidden, Sr. was such that the jury could not reasonably find that the defendant had no significant history of prior criminal activity.

*State v. Sidden,* 347 N.C. 218, 232, 491 S.E.2d 225, 232 (1997). But our holding in *Sidden* was predicated upon the additional fact that the defendant there had committed the murder of Garry Sidden, Sr. prior to the two murders for which he was being tried and sentenced. *Id.* This prior murder qualified as the "prior criminal activity" for purposes of the other two murders. *Id.*

Defendant's history of prior criminal activity is less significant than that of criminal defendants in prior cases in which this Court has held that the (f)(1) mitigating circumstance should not be submitted to the jury. *See State v. Daughtry,* 340 N.C. 488, 522, 459 S.E.2d 747, 765 (1995) (the defendant often beat the murder victim, shot an acquaintance in the leg, and was convicted of driving under the influence and assault inflicting serious injury with a large stick), *cert. denied,* 516 U.S. 1079, 133 L. Ed. 2d 739 (1996); *State v. Jones,* 339 N.C. 114, 157, 451 S.E.2d 826, 850 (1994) (the defendant had three prior violent felony convictions: two counts of felonious assault and one count of robbery), *cert. denied,* 515 U.S. 1169, 132 L. Ed. 2d 873 (1995); *State v. Skipper,* 337 N.C. at 44, 446 S.E.2d at 276 (the defendant had been convicted in 1978, 1982, and 1984 of assault with a deadly weapon inflicting serious injury); *State v. Sexton,* 336 N.C.

321, 375, 444 S.E.2d 879, 910 (the defendant was convicted for two counts of assault on a female, one of which involved choking a female less than one year before the strangulation of the murder victim; moreover, the defendant testified that he did not remember choking the assault victim, a circumstance strikingly similar to his professed lack of memory about the details of the strangulation of the murder victim), *cert. denied,* 513 U.S. 1006, 130 L. Ed. 2d 429 (1994); *State v. Jones,* 336 N.C. 229, 247, 443 S.E.2d 48, 56 (the defendant had six or seven times broken into the same convenience store where the murder occurred and had stolen various items from the store and had broken into a pawn shop and stolen several guns, one of which he used to kill the victim), *cert. denied,* 513 U.S. 1003, 130 L. Ed. 2d 423 (1994); *State v. Robinson,* 336 N.C. at 119, 443 S.E.2d at 326 (the defendant had been involved in crime since adolescence; sometimes earned $4,000 to $5,000 per week selling drugs; had been convicted of the robbery of a business and two of its employees; and in the murder for which he was being sentenced, had come from Maryland to sell drugs and commit a robbery).

Given the largely nonviolent nature of defendant's prior criminal activities, we conclude that a juror could reasonably have concluded that defendant had no significant history of prior criminal activity. For this reason the trial court erred by failing to submit the (f)(1) mitigating circumstance for the jury's consideration.

The trial court's error in failing to submit statutory mitigating circumstances where there is sufficient evidence " 'is prejudicial unless the State can demonstrate on appeal that it was harmless beyond a reasonable doubt.' " *Jones,* 346 N.C. at 717, 487 S.E.2d at 722 (quoting *Quick,* 337 N.C. at 363, 446 S.E.2d at 538). Here, the State is not able to demonstrate that the failure to submit either the (f)(2) or the (f)(1) mitigators was harmless beyond a reasonable doubt. As to the (f)(2) mitigator, that defendant was under the influence of a mental or emotional disturbance, we cannot conclude that, had this mitigating circumstance been submitted to the jury, no juror would have found its existence; nor can we conclude with certainty " 'that had this statutory mitigating circumstance been found and balanced against the aggravating circumstances, the jury would still have returned a sentence of death.' " *Quick,* 337 N.C. at 363, 446 S.E.2d at 538 (quoting *Mahaley,* 332 N.C. at 599, 423 S.E.2d at 67-68). As to the (f)(1) mitigator, that defendant had no significant history of prior criminal activity, we note that one or more jurors found as a nonstatutory mitigating circumstance that "[t]he violent nature of the crime for which

the defendant has been convicted is completely out of character with his prior behavior." Given this recognition by one or more members of the jury of defendant's previously nonviolent character, it is reasonably likely that had they been permitted to consider whether his criminal history was significant, one or more jurors would have found this statutory mitigating circumstance as well. For these reasons defendant is entitled to a new capital sentencing proceeding.

We conclude that the guilt-innocence phase of defendant's trial was free from prejudicial error. However, we also conclude that the trial court committed reversible error during the sentencing proceeding by failing to submit the (f)(1) and (f)(2) mitigating circumstances. Therefore, we vacate defendant's death sentence and remand for a new capital sentencing proceeding.

NO ERROR IN GUILT-INNOCENCE PHASE; DEATH SENTENCE VACATED; REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.

Chief Justice MITCHELL dissenting.

In the present case, the State peremptorily challenged two of the three black venire members from the first panel of twelve prospective jurors. The State exercised its first two peremptory challenges against two black prospective jurors, Mr. Greene and Mr. McKinney. Defendant objected, and the trial court conducted a hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986) (Equal Protection Clause), and *State v. Crandell*, 322 N.C. 487, 501, 369 S.E.2d 579, 587 (1988) (Article I, Section 26 of the Constitution of North Carolina).

The trial court found, *inter alia*, that defendant is a black man, that the victim was a white female, and that the venire contained "very few blacks." The trial court concluded that defendant had established a *prima facie* case of racial discrimination in the exercise of the State's peremptory challenges and required the State to present racially neutral reasons for its peremptory challenges of Mr. Greene and Mr. McKinney. The trial court concluded that the reasons given by the State for excusing Mr. Greene were racially neutral and therefore sufficient to justify the peremptory challenge. Based on proper findings of fact, however, the trial court concluded that the State's professed reason for excusing Mr. McKinney was "not sufficient to overcome the presumption of discrimination nor was it race

neutral" and that it appeared to the trial court to be "somewhat pretextual and an afterthought." The trial court then proposed to remedy the discriminatory use of this peremptory challenge by excusing the entire initial jury panel of twelve. The State, however, chose to withdraw its peremptory challenge of prospective juror McKinney and to allow him to be seated as a juror, rather than have the trial court excuse the entire panel. For the following reasons, I believe that the trial court reached the correct conclusion in deciding to excuse the entire panel, but erred when it changed its ruling in response to the State's withdrawal of its peremptory challenge of juror McKinney.

In *State v. McCollum*, 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994), the trial court concluded that a *Batson* violation had occurred. The defendant sought to have the violation corrected by requesting that the trial court seat the three black jurors the State had removed by peremptory challenges. The trial court declined to seat these jurors and ordered that the jury selection process begin anew with an entirely new panel of prospective jurors. *Id.* at 235, 433 S.E.2d 158-59. On appeal to this Court, the defendant argued that the trial court had erred in applying this remedy for the *Batson* violation. We rejected the defendant's argument.

In *McCollum*, we noted that the Supreme Court of the United States had, in *Batson*, 476 U.S. at 99 n.24, 90 L. Ed. 2d at 90 n.24, expressly declined to express a view on whether the more appropriate remedy for racial discrimination in jury selection was to discharge the venire and select a new jury from a new panel or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated. *McCollum*, 334 N.C. at 235, 433 S.E.2d at 159. However, we then went on to state the following:

> We believe that the better practice is that followed by the trial court in this [*McCollum*] case, and that neither *Batson* nor *Powers [v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411 (1991),] requires a different procedure. We recognize and endorse the equal protection right of prospective jurors explained in detail in *Powers*. However, we conclude that the primary focus in a criminal case— particularly a capital case such as this—must continue to be upon the goal of achieving a trial which is fair to both the defendant and the State. To ask jurors who have been improperly excluded from a jury because of their race to then return to the jury to remain unaffected by that recent discrimination, and to render an impartial verdict without prejudice toward either the State or the

defendant, would be to ask them to discharge a duty which would require near superhuman effort and which would be extremely difficult for a person possessed of any sensitivity whatsoever to carry out successfully. As *Batson* violations will always occur at an early stage in the trial before any evidence has been introduced, the simpler, and we think clearly fairer, approach is to begin the jury selection anew with a new panel of prospective jurors who cannot have been affected by any prior *Batson* violation.

*McCollum*, 334 N.C. at 236, 433 S.E.2d at 159. We then concluded that even if we assumed *arguendo* that the trial court had erred by failing to seat the prospective jurors who had been improperly excused, the error was harmless beyond a reasonable doubt. *Id.* We said that this was so because the trial court's action had provided the defendant with exactly that which he was entitled to receive—trial by a jury selected on a nondiscriminatory basis. *Id.*

I wish to make it clear here that I do not intend to imply any criticism of the learned trial court. Clearly, it was, and we are, dealing here with an area of the law in which the Supreme Court of the United States has not yet given us clear guidance. The trial court did the best it could when faced with this situation not of its making. However, based upon the reasoning of this Court in *McCollum*, as quoted above, I now conclude that the only remedy for a *Batson* violation which will both be practical and ensure a fair trial is to "begin the jury selection anew with a new panel of prospective jurors who cannot have been affected by any prior *Batson* violation." *Id.* Accordingly, I believe that defendant is entitled to a new trial as a matter of both federal and state constitutional law. For this reason, I respectfully dissent.

Justice FRYE dissenting in part.

As the majority correctly indicates, the use of peremptory challenges for racially discriminatory reasons violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). The North Carolina Constitution, Article I, Section 26, also prohibits the exercise of peremptory strikes solely on the basis of race. *State v. Ross*, 338 N.C. 280, 284, 449 S.E.2d 556, 560 (1994). Unfortunately, the trial court's handling of defendant's *Batson* challenges in this case circumvented the procedures established by the United States

STATE v. FLETCHER

[348 N.C. 292 (1998)]

Supreme Court and this Court to avoid racial discrimination in the selection of a jury.

The Supreme Court enunciated the procedure that a trial court must utilize when a defendant objects to a prosecutor's use of peremptory challenges to remove prospective jurors of the defendant's race. *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-88. This Court has frequently reiterated this procedure. *See, e.g., State v. Porter*, 326 N.C. 489,. 497, 391 S.E.2d 144, 150 (1990). First, a defendant must make out a *prima facie* case of racial discrimination, which he may do by showing:

> (1) he is a member of a cognizable racial minority, (2) members of his racial group have been peremptorily excused, and (3) racial discrimination appears to have been the motivation for the challenges.

*Id. But see also Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411 (1991) (modifying *Batson* by holding that a defendant has standing to object to racially discriminatory use of peremptory challenges even if there is not racial identity between defendant and the excused juror); *State v. Beach*, 333 N.C. 733, 430 S.E.2d 248 (1993). If the defendant succeeds in establishing a *prima facie* case, the burden shifts to the State to come forward with a race-neutral reason for each challenged peremptory strike. *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991). The rebuttal must be clear, reasonably specific, and related to the particular case to be tried. *Id.* at 17, 409 S.E.2d at 297. The defendant also "has a right of surrebuttal to show that the prosecutor's explanations are a pretext." *Porter*, 326 N.C. at 497, 391 S.E.2d at 150. Finally, "[o]nce the State gives an explanation for its peremptory challenges, the trial court then determines 'whether the defendant has carried his burden of proving purposeful discrimination.' " *State v. Bond*, 345 N.C. 1, 20-21, 478 S.E.2d 163, 173 (1996) (quoting *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991)), *cert. denied*, —— U.S. ——, 138 L. Ed. 2d 1022 (1997). The procedure used by the trial court in this case cut short the inquiry required to establish whether the State's given reasons were nondiscriminatory.

The majority concludes that the trial court correctly determined that defendant had not established a *prima facie* case of racial discrimination in the peremptory challenges of two black prospective jurors, Mrs. Hudson and Mr. Watkins. I disagree.

STATE v. FLETCHER

[348 N.C. 292 (1998)]

At the time of the peremptory challenges of Mrs. Hudson and Mr. Watkins, the State had already peremptorily challenged two of three black venire members from the first panel of prospective jurors. The prosecutor exercised his first two peremptory challenges against two black prospective jurors, Mr. Greene and Mr. McKinney. Defendant objected. The trial court conducted a *Batson* hearing and found, *inter alia*, that defendant is a black man, that the victim was a white female, and that the venire contained "very few blacks." Concluding that defendant had established a *prima facie* case of racial discrimination in the exercise of the State's peremptory challenges, the trial court required the State to come forward with race-neutral reasons for the strikes. The trial court concluded that the reasons given to challenge Mr. Greene were race-neutral and sufficient to justify the peremptory challenge. However, as to Mr. McKinney, the trial court concluded that the proffered reason for the strike was not race-neutral and appeared to be pretextual. The trial court concluded that the entire jury panel should be discarded to remedy the discriminatory use of a peremptory challenge. The State chose to withdraw its challenge of juror McKinney-rather than discard the entire jury panel.

Following the State's peremptory challenge of the next black prospective juror, Mrs. Hudson, defendant again objected. After noting that a *Batson* hearing had previously been conducted, the trial court stated:

> At this point the prosecution has accepted two black jurors, has excused one; if Mrs. Hudson is excused, that will be two out of four. I do not find that this raises the presumption required to make the prosecution state its reasons. There are sufficient black jurors remaining on the panel.

(Emphasis added.) The trial court declined to find that defendant had made a *prima facie* case of racial discrimination in the State's peremptory challenge of Mrs. Hudson.

I disagree with the majority's conclusion that the trial court was correct in this ruling. The trial court found that the prosecutor had "accepted" the seating of two black jurors and had excused one; however, the State "accepted" juror McKinney only after the court decided to remedy the racial discrimination by dismissing the entire jury panel.

Likewise, when Mr. Watkins was subsequently peremptorily challenged, the State had exercised peremptory challenges against four of

five black jurors, even though it ultimately "accepted" two of five. In response to defendant's *Batson* objection, the trial court again noted that two black jurors in the pool had been seated. The trial court then stated that while it was "a little bit troublesome" that three out of five black jurors would have been excused by the State, it would not find that defendant had made out a *prima facie* case of discrimination under *Batson*.

I believe that the trial court erred in both instances by ignoring the State's prior attempt to exercise a peremptory challenge in a racially discriminatory manner and focusing instead on the number of black jurors seated. This evidence of purposeful discrimination is especially significant in light of the circumstances of this case, where defendant is a black man charged with the murder of an elderly white woman. Such circumstances make this a case especially "susceptible to racially discriminatory jury selection." *State v. Thomas*, 329 N.C. 423, 431, 407 S.E.2d 141, 147 (1991).

The majority finds it unnecessary to address defendant's argument that the trial court failed to make findings under the third step of the *Batson* analysis because of its conclusion that the trial court did not err in finding no *prima facie* case of discrimination. However, I believe that defendant sufficiently raised "an inference of purposeful discrimination," *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 88, such that the trial court should have proceeded to conduct a further inquiry. The trial court should have made findings and conclusions as to whether the State's reasons were legitimate and race-neutral or pretextual and discriminatory. In this case, the trial court failed to "rule[] on the ultimate question of intentional discrimination." *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405.

For the foregoing reasons, I would hold that the trial court erred by concluding that defendant failed to establish a *prima facie* case of racial discrimination as to the peremptory challenges of prospective jurors Hudson and Watkins. I would therefore remand this case to the trial court for a hearing on the *Batson* issue. If the State's articulated reasons for the challenges are determined to be race-neutral, defendant is entitled to produce evidence to rebut the State's reasons and prove that the State engaged in purposeful racial discrimination. If defendant can meet this burden, then he must be awarded a new trial.

Justice WHICHARD joins in this dissenting opinion.